UNITED STATES, Appellee,

v.

Jesus M. LOPEZ–GIL, Defendant,
Appellant.

No. 90–2059.

United States Court of Appeals,
First Circuit.

Heard Oct. 10, 1991.

Decided Jan. 3, 1992.

Opinion on Rehearing May 12, 1992.

Rachel Brill with whom Aida M. Delgado
Colon, Acting Federal Public Defender, Old
San Juan, P.R., was on brief, for defen-
dant, appellant.

Jose A. Quiles with whom Jeanette Mercado–Rios, Asst. U.S. Atty., San Juan, P.R., and Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., were on brief, for appellee.

Before CAMPBELL, Circuit Judge, BROWN * and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Appellant Jesus M. López–Gil was convicted by a jury of knowing and intentional possession, with intent to distribute, approximately 18 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1); of knowing and intentional importation of cocaine into the United States, in violation of 21 U.S.C. § 952(a); and of possession of cocaine on board an aircraft without the cocaine being entered on the cargo manifest or the official supply list, in violation of 21 U.S.C. § 955.[1] López–Gil appeals his conviction on the ground that there was insufficient evidence at trial to support a conviction for importation of cocaine. He appeals his sentence on two grounds: that the court erred in its determination of the type and quantity of the cocaine in calculating his base offense level under the sentencing guidelines; and that the court erred in failing to make a downward adjustment for his role as a courier of the cocaine.

We affirm the conviction but remand for resentencing.

## BACKGROUND

On November 2, 1989, López–Gil, a Colombian national, arrived at the Luis Muñoz Marín International Airport in San Juan, Puerto Rico aboard Iberia Flight Number 924. He was en route to Madrid, Spain from Quito, Ecuador. The flight made two stops, one in Bogotá, Columbia and another in San Juan. Upon routine inspection and interview of the flight's passengers in the in-transit lounge,[2] Customs Contraband Enforcement Team (CET) officials detained López–Gil because he appeared nervous and was perspiring when questioned.

During their inspection of the cargo, CET officials opened one of two black fiberglass suitcases and upon ripping the lining, discovered glue marks and bulges. CET field tested both suitcases and they reacted positive for cocaine. López–Gil's name and address were on each suitcase. Claim tags attached to his plane ticket matched those on the suitcases.

A Drug Enforcement Administration (DEA) chemist, Ivette Maria Vallejo, tested the suitcases under laboratory conditions and found cocaine secreted within the fiberglass. She weighed the suitcases without the metal trimming or metal parts and determined a net weight of approximately 14 kilograms. Vallejo extracted the controlled substance from the fiberglass and the resin with chloroform, and then ran methanol and ether through the controlled substance to clean it for testing. She conducted infrared and mass spectrometer tests on the controlled substance which tested positive for cocaine. She determined the net weight of the cocaine to be approximately 2.6 kilograms.

Pursuant to the United States Sentencing Commission, *Guidelines Manual* § 2D1.1 (November 1990) ("Sentencing

---

* Of the Fifth Circuit, sitting by designation.

1. The pertinent portions of the statute read as follows:

 [I]t shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;....
 21 U.S.C. § 841(a)(1).
 It shall be unlawful to import into the customs territory of the United States from any place outside thereof ... any controlled substance....
 21 U.S.C. § 952(a).

 It shall be unlawful for any person to bring or possess on board any ... aircraft ... arriving in or departing from the United States or the customs territory of the United States, a controlled substance ... unless such substance or drug is a part of the cargo entered in the manifest or part of the official supplies of the ... aircraft.
 21 U.S.C. § 955.

2. The in-transit lounge is an enclosed area at the airport where international passengers en route to a destination other than the United States are ushered directly from the plane and held there during the customs check.

Guidelines") the district court assigned Ló-pez–Gil a base offense level of 40. The court based its calculation on its determination that the controlled substance was co-caine base and by using the net weight of the two suitcases and the cocaine sub-stance. The court found that because Ló-pez–Gil "acted as a courier and apparently had no proprietary interest in the cocaine as such, a sentence in the lower end of the guideline range is warranted." Sent. Tr. p. 14. The court refused to grant him a two-level reduction for minor involvement. The court sentenced López–Gil to a term of imprisonment of 292 months and to a term of supervised release of 5 years, as to each count, to be served concurrently. He now appeals from that judgment and sentence.

## IMPORTATION OF COCAINE

█ López–Gil asserts that the evidence was insufficient for the jury to convict him of importing cocaine into the United States, in violation of 21 U.S.C. § 952(a). He con-tends that because he was in-transit when arrested in San Juan, with his destination being Spain and not the United States, he cannot be convicted of a crime requiring the elements of knowledge of and intention to import cocaine into the United States. Our duty is to determine whether a reason-able jury could, after hearing all the evi-dence, conclude that the defendant was guilty of the specific crime charged beyond a reasonable doubt. *United States v. Piedrahita–Santiago*, 931 F.2d 127 (1st Cir.1991). We find that it could.

López–Gil acknowledges that this circuit interprets the crime of importation to mean that the defendant's intended final destina-tion for the controlled substance does not have to be the United States. In *United States v. Mejia–Lozano*, 829 F.2d 268 (1st Cir.1987), we sustained a conviction for im-portation of cocaine, in violation of 21 U.S.C. § 952(a). The defendant, who was en route to Switzerland, had disembarked into an in-transit holding area in San Juan. We found that 21 U.S.C. § 952(a) does not require that the accused form the specific intent to bring drugs into the country—or even that she be aware that her interna-tional flight would stop in the United States. We held that "the offense was complete the moment defendant, knowingly in possession of cocaine, landed in this country with the contraband, regardless of her knowledge of the aircraft's itinerary or the planned terminus of her journey." *Id.* at 272. In order to convict the defendant of importing drugs, "[i]t is sufficient that the defendant knowingly possessed the contraband, and brought it into the jurisdic-tion of the United States." *Id.* at 271. *Accord United States v. Ortiz–Alarcon*, 917 F.2d 651, 652 (1st Cir.1990); *United States v. Franchi–Forlando*, 838 F.2d 585 (1st Cir.1988); *United States v. McKenzie*, 818 F.2d 115 (1st Cir.1987). The holding in *Mejia–Lozano* controls. We affirm López–Gil's conviction for importing cocaine into the United States.

## SENTENCING

1. *Weight*

█ López–Gil argues that the district court erred in its determination of the weight of the controlled substance (14 kilo-grams) for sentencing purposes. The court included the net weight of the suitcases in its calculation of the defendant's base of-fense level of 40. López–Gil contends that the correct weight for calculation purposes should have been the net weight of the cocaine mixture only (2.6 kilograms). The difference in terms of sentencing between the two calculations is substantial. Had the court used the 2.6 kilogram weight in calculating the base offense level under the Sentencing Guidelines, López–Gil would have received a base offense level of 28, assuming that the substance is cocaine and not cocaine base as we will discuss next. Sentencing Guidelines § 2D1.1(b)(8). Based on the trial court's findings, the defendant would probably have received 78 months for each count. Using 40 as the base offense level, the court sentenced the defendant to concurrent sentences of 292 months for each count.

In *United States v. Mahecha–Onofre*, 936 F.2d 623 (1st Cir.1991), we interpreted the recent Supreme Court holding in *Chap-man v. United States*, — U.S. —, 111

S.Ct. 1919, 114 L.Ed.2d 524 (1991), to require that in determining the weight of the cocaine for sentencing purposes, the weight of the suitcases should be included. The facts in *Mahecha–Onofre* are similar to the ones in the instant case. Mahecha–Onofre was a passenger on Iberia Airlines Flight 910, which stopped in San Juan on its way from Bogotá, Colombia, to Madrid, Spain. Customs officials found two suitcases emanating a strong chemical odor and upon conducting a field test on them found that the suitcases themselves were made of cocaine. Later testing revealed that the suitcases contained approximately 2.5 kilograms of cocaine bonded chemically with the acrylic suitcase material. Mahecha–Onofre appealed on the ground, *inter alia*, that the court committed a legal error, when, for sentencing purposes, it counted the total weight of the suitcases, minus all metal parts (about 12 kilograms), instead of the weight of the cocaine itself (about 2.5 kilograms).

We held that the court properly included the weight of the suitcases for sentencing purposes. Our analysis ascertained that "the suitcase/cocaine 'mixture' or 'substance' fits the statutory and Guideline definitions as the Supreme Court has recently interpreted them in *Chapman*." *Mahecha–Onofre*, 936 F.2d at 626. We interpreted *Chapman* to mean that,

> Unlike blotter paper or cutting agents, the suitcase material obviously cannot be consumed; and the cocaine must be separated from the suitcase material before use. We do not believe, however, that this fact alone can make a difference to the outcome, for "ingestion" would not seem to play a critical role in the definition of "mixture" or "substance."

*Id.*

In *Chapman*, the defendants were convicted of selling sheets of blotter paper containing LSD, in violation of 21 U.S.C. § 841(a). The district court used the total weight of the paper and LSD together in calculating the sentences under the statute and the base offense level under the Sentencing Guidelines. The Supreme Court held that the statute requires the weight of the carrier medium to be included when determining the appropriate sentencing for trafficking in LSD. The Court found that "the blotter paper used in this case, and blotter paper customarily used to distribute LSD, is a 'mixture or substance containing a detectable amount' of LSD." *Chapman*, 111 S.Ct. at 1925. The Court determined that "[n]either the statute nor the Sentencing Guidelines define the terms 'mixture' and 'substance,' nor do they have any established' common law meaning. Those terms, therefore, must be given their ordinary meaning." *Id.*

The Court reasoned that under the plain meaning of the term mixture, the blotter paper would be part of the LSD mixture.

> Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying the LSD can be and often is ingested with the drug.

*Id.* 111 S.Ct. at 1926. Accounting for the likelihood of progeny with "absurd" interpretations, the Court differentiated between a carrier medium, like blotter paper which can be ingested, and containers.

> The term [mixture] does not include LSD in a bottle, or LSD in a car, because the drug is easily distinguished from, and separated from, such a "container." The drug is clearly not mixed with a glass vial or automobile; nor has the drug chemically bonded with the vial or car. It may be true that the weights of containers and packaging materials generally are not included in determining a sentence for drug distribution, but that is because those items are also clearly not mixed or otherwise combined with the drug.

*Id.*

In elucidating congressional intent, the Court determined that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence."

*Id.* 111 S.Ct. at 1925, *citing* H.R.Rep. No. 99–845, pt. 1, pp. 11–12, 17 (1986). The court concluded,

> By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity. This is a rational sentencing scheme.

*Id.* 111 S.Ct. at 1928.

We recognize that the Sixth and Eleventh Circuits have interpreted *Chapman* differently from this circuit.[3] *See United States v. Jennings & Stepp,* 945 F.2d 129 (6th Cir.1991), *United States v. Rolande-Gabriel,* 938 F.2d 1231 (11th Cir.1991).

In *Jennings & Stepp,* the defendants were convicted of, *inter alia,* possession with intent to distribute over 100 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). In computing the base offense under the Sentencing Guidelines the district court weighed the total amount of the mixture in a crockpot (4 kilograms). The mixture included methamphetamine, along with unreacted chemicals and by-products, both of which are poisonous if ingested. The Sixth Circuit adopted *Chapman's* "market-oriented" approach to punishing drug trafficking. The court held that the district court erred in including the poisonous and unusable parts of the mixture for sentencing purposes. *Jennings & Stepp,* 945 F.2d at 136–137. The court believed that the legislative intent underlying the sentencing scheme of both the statute and the Sentencing Guidelines compelled its conclusion. *Id.*

The Eleventh Circuit, in *Rolande-Gabriel,* held that the district court erred in using the weight of unusable non-drug liquid in calculating the base offense level (241.6 grams) under the Sentencing Guidelines. 938 F.2d at 1237. Like the Sixth Circuit, the Eleventh Circuit in reaching its conclusion applied the *Chapman* standard of usability, consumability, and readiness for wholesale or retail distribution. The court determined that because the government chemist easily distinguished the unusable liquid from the drug powder and its cutting agent, the unusable liquid is similar to the "packaging" material referred to by the Supreme Court in *Chapman. Id.* The Eleventh Circuit reasoned that its holding comported with the Sentencing Guidelines' stated purpose of sentencing uniformity.[4] *See* Sentencing Guidelines, ch. 1, pt. A, at 1.1–1.4. The court concluded that to weigh the unusable liquid mixture would result in an "absurd and glaringly unjust result."[5] *Id.*

---

**3.** In a pre-*Chapman* decision, the Fourth Circuit held that the combined weight of the uncut LSD and carrier medium of blotter paper could be used to determine the base offense level under the Sentencing Guidelines. *United States v. Daly,* 883 F.2d 313 (4th Cir.1989). The Eighth Circuit held, prior to *Chapman,* that the trial court should have used the *net* weight (weight of mixture without the packaging) instead of the *gross* weight (weight of mixture with the packaging) for sentencing purposes. *United States v. Luster,* 896 F.2d 1122 (8th Cir.1990).

**4.** While the commission commentary to section 2D1.1 provides that the term "mixture" has the same meaning as it does in 21 U.S.C. § 841, which does not differentiate between various types of mixtures, the court found that a strict adherence to the committee's commentary would include all mixtures but result in "disparate and irrational sentences." *United States v. Rolande-Gabriel,* 938 F.2d 1231, 1235 (11th Cir. 1991). Therefore, the Eleventh Circuit reads "mixture" in conjunction with the stated purposes behind the Sentencing Guidelines; thereby weighing only "usable or consumable drug mixture." *Id.*

**5.** The court reasoned,

> Although it is logical to base sentences upon the gross weight of usable mixtures, it is fundamentally absurd to give an individual a more severe sentence for a mixture which is unusable and not ready for retail or wholesale distribution while persons with usable mixtures would receive far less severe sentences. For example, Rolande-Gabriel's sentence was based on a weight of 241.6 grams, despite the fact that only 72 grams of the mixture were usable; however, a defendant possessing a usable mixture of cocaine mixed with a cutting agent weighing 75 grams would receive a significantly smaller sentence than Rolande-Gabriel. This is manifestly unjust and defeats the Sentencing Guidelines' stated policy of sentencing uniformity and proportionality.
> *Rolande-Gabriel,* 938 F.2d at 1237.

We recognize that if this case were before the Sixth or Eleventh Circuit today, the result would be different. We, however, follow First Circuit precedent and affirm the district court's use of the suitcases' weight in calculating López–Gil's sentence under the Sentencing Guidelines.

## 2. *Type of Substance*■

We examine next López–Gil's assertion that the district court erred in its classification of the cocaine substance as cocaine base, instead of cocaine, for sentencing purposes. In reaching our conclusion, we must determine whether the substance at issue constitutes cocaine base or cocaine as defined by the statute and the Sentencing Guidelines. In prior cases interpreting 21 U.S.C. § 841(b), we have held that the use of the term "cocaine base" is not unconstitutionally vague. *See, e.g., United States v. Barnes*, 890 F.2d 545 (1st Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). The issue before us today requires us to determine the correct definition of cocaine base as a matter of statutory interpretation. This issue is one of first impression for us. The interpretation of the term "cocaine base" is a legal question which we review *de novo*. *See United States v. Shaw*, 936 F.2d 412, 414 (9th Cir.1991).

The trial testimony of the DEA chemist, Vallejo, described the chemical processes she used to obtain a sample of the controlled substance. She testified that she found, as a result of the chemical analysis, "cocaine *as* the base." Trial Tr. p. 107 (emphasis added). Trial counsel recalled Vallejo during the pre-sentencing hearing, Vallejo testified that the controlled substance was not crack.

Q  Miss Vallejo, you were the person that analyzed the narcotic drug found in the luggage?

A  Yes, sir.

Q  And in the report that you submitted at the time of the trial you stated there that it was cocaine base, is that correct?

A  Yes, sir. . . .

Q  Miss Vallejo, was the cocaine base found in the luggage crack?

A  No, it was in the state it was received, no. It was not crack.

Q  Most or some of the analysis made of cocaine base could be crack?

A  Yes.

Q  And in this case it was not?

A  No.

THE COURT: It was not crack?

THE WITNESS: It was not crack.

Trial Tr., Vol. V, p. 5–6. Our analysis proceeds on the basis that the controlled substance was *not* crack.

In examining the statute and the Sentencing Guidelines, we find that neither defines the term "cocaine base." [6] The Guidelines' drug equivalency table equates cocaine base with "crack." Sentencing Guidelines, § 2D1.1 ("1 gm of Cocaine Base ('Crack') equals 100 gm of cocaine/20 gm of heroin").

One other circuit has addressed the issue of defining the term "cocaine base." The Ninth Circuit recently concluded that "Congress and the Commission must have intended 'cocaine base' to include 'crack,' or 'rock cocaine,' which we understand to mean cocaine that can be smoked, unlike cocaine hydrochloride." *United States v. Shaw*, 936 F.2d 412, 416 (9th Cir.1991). The Ninth Circuit examined the legislative history of 21 U.S.C. § 841(b). The court found that Congress when it used the term "cocaine base" meant "cocaine freebase," which refers to cocaine that can be smoked. *Id.* at 416. The court cited to the following House report:

In the summer of 1986, the wave of cocaine abuse epidemic which had been

---

6. We construe the statute and the Sentencing Guidelines to be consistent with each other in their use of the term "cocaine base." The Sentencing Commission has explained that it "used the sentences provided in, and equivalences derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for the guideline sentences." Sentencing Guidelines, § 2D1.1, comment. (n. 10). Thus, we assume that the Commission intended the terms they used to have the same meanings as the terms Congress used.

growing for a decade began to crash upon American cities in the form of "crack." Crack, the street name for *cocaine freebase*, a preparation of cocaine hydrochloride and sodium bicarbonate, can be smoked and consequently produces intense moments of the cocaine "rush,"....

H.R.Rep. No. 99–846, 99th Cong., 2d Sess. 4 (1986) (emphasis added).

Both the House and the Senate each had a version of a bill to amend 21 U.S.C. § 841(b). The House bill, H.R. 5394, 99th Cong., 2d Sess. § 101 (1986), provided for tougher penalties for "cocaine freebase." The Senate bill, S. 2878, 99th Cong., 2d Sess. § 1002, 132 Cong.Rec. S13649 (daily ed. Sept. 25, 1986), provided penalties for "cocaine base." Congress ultimately enacted the Senate version. Nothing in the legislative history shows that the Senate version intended a different meaning for "cocaine base" from the House use of "cocaine freebase." Rather, the legislative materials demonstrate that Congress, in passing the legislation, was concerned primarily with the crack epidemic, and it described crack as cocaine that is smoked rather than snorted. *Shaw*, 936 F.2d at 416 (citing to statements made by the legislation's sponsors, Rep. Frank Annunzio, 132 Cong.Rec. H6544 (daily ed. Sept. 10, 1986), Sen. Chic Hecht, *Id.* at S13770 (Sept. 26, 1986)). Our examination of the legislative history concurs with the findings reached by the Ninth Circuit.

We, as other circuits, have addressed this issue indirectly by ruling that the term "cocaine base" is not unconstitutionally vague. In our discussion of the term, we have inferred that cocaine base means crack. In *United States v. Barnes*, the forensic chemist testified at trial that cocaine base differs from cocaine hydrochloride in its molecular structure. She said that "cocaine base is commonly called 'crack' cocaine which is generally smoked." 890 F.2d at 548. We found that "[c]ocaine hydrochloride is water soluble, formed in crystals or flakes, and generally *snorted* by users. Cocaine base is not water soluble, concentrated in a hard rock-like form, and generally *smoked*." *Id.* at 552. We

also found that possession of the substance in question "is specifically what Congress intended to punish. The chunks seized were in the form of cocaine known as 'crack,' which was a primary target of the Narcotics Penalties and Enforcement Act of 1986." *Id.* at 553. We held in *Barnes* that because the substance in issue was not a new form or derivative of cocaine which was not originally contemplated by Congress, the term "cocaine base" did not violate the defendant's due process rights. *Id.* Accord *United States v. Thomas*, 932 F.2d 1085 (5th Cir.1991); *United States v. Pinto*, 905 F.2d 47 (4th Cir.1990); *United States v. Levy*, 904 F.2d 1026 (6th Cir. 1990); *United States v. Luster*, 896 F.2d 1122 (8th Cir.1990).

The government contends that "cocaine base" as used in *Barnes* and *Shaw* is not equated with "crack," but rather *includes* crack. We find the government's contention to be unfounded for two reasons. First, both the *Barnes* and *Shaw* courts, along with the other courts cited above, did not distinguish between cocaine base and crack. While they may not have explicitly held that cocaine base equals crack, a complete, rather than selective, reading of the opinions compels the conclusion that that was indeed the courts' meaning.

Second, the government has not introduced any evidence of the existence of a new derivative/form of cocaine base that is separate and distinct from crack, nor are we aware of any. Our understanding is that there are two forms of cocaine that people use: one is cocaine, which is generally snorted, and the other is crack, which is generally smoked. While there exists a wide variety of each type according to purity, quality, and grade, the cocaine user has the option of using either cocaine or crack, not a third variation.

We conclude that "cocaine base" means "crack" for purposes of 21 U.S.C. § 841(b) and the Sentencing Guidelines. The trial evidence shows that the controlled substance was not crack. We hold, therefore, that the district court erred in using "cocaine base" as the standard for sentencing

the defendant. We must remand to the district court for a new sentencing determination.

### 3. *Mitigating Role in Sentencing Process*

▉ López–Gil contends that the trial court erred in refusing to make a downward adjustment of two points after determining that he acted only as a courier. The Sentencing Guidelines in section 3B1.2(b) provides for a downward reduction by two points in the sentencing of a defendant whose role in the offense "makes him substantially less culpable than the average participant." *Id.* § 3B1.2 (background commentary). A defendant has the burden of proving entitlement to such a downward adjustment, *United States v. Ocasio*, 914 F.2d 330, 332 (1st Cir.1990), and can only prevail on appeal by demonstrating that the district court's determination as to his role in the offense was clearly erroneous. *United States v. Rosado–Sierra*, 938 F.2d 1, 2 (1st Cir.1991).

We have found that a defendant who is a drug courier is not entitled as of right to a reduction of the offense level as a minimal or minor participant. *United States v. Paz Uribe*, 891 F.2d 396, 399 (1st Cir.1989), *cert. denied*, 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990) ("even if the court found that Paz was only a courier, he would not automatically be entitled to a reduction."). The Sentencing Guidelines do not *obligate* a court to adjust for mitigating circumstances but rather *permit* such an adjustment. *See* Sentencing Guidelines, ch. 1, pt. A, 1.5–1.6. The district court, therefore, was within its discretionary powers in deciding not to reduce López–Gil's base offense level.

We affirm the district court's refusal to adjust downward.

Affirmed in part, reversed in part and remanded for further sentencing proceedings.

JOHN R. BROWN, Senior Circuit Judge, concurring and dissenting in part.▉

I concur fully in the court's decision to affirm the conviction. I respectfully dissent, however, in the court's determination of the controlled substance's weight and in the finding that the controlled substance was in fact cocaine and not cocaine base.

### *A Suitcase Mix or A Cocaine Mix*

As in this court's earlier decision in *Mahecha–Onofre*,[7] the court reads *Chapman*[8] to require that the weight of the suitcase material be included as part of the "mixture" or "substance" for sentencing purposes. I disagree.

I am keenly aware that, consistent with the practices of the First Circuit, as a visiting judge, I am bound the same as a First Circuit judge by the court's prior decisions. But, as would a judge in active service, I have the privilege, if not the duty, to point out deficiencies in a prior decision and to encourage en banc review—a situation in which again the role of a visiting judge is unique in the sense that he or she is not qualified either to request or cast a full vote for en banc review, and certainly never participate in the en banc decision to reject the challenged action. It is in that spirit that my compulsory affirmance translates into a dissent.

Like the Sixth[9] and Eleventh[10] Circuits, I would interpret *Chapman* as applying only to carrier mediums that are usable, consumable, and which make the drug ready for wholesale or retail distribution.

---

**7.** *United States v. Mahecha–Onofre*, 936 F.2d 623 (1st Cir.1991).

**8.** *Chapman v. United States*, — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

**9.** *See United States v. Jennings & Stepp*, 945 F.2d 129 (6th Cir.1991) (adopting the "market-orient-ed" approach, the court held that the poisonous and other unusable parts of the methamphetamine mixture should not have been counted for sentencing purposes).

**10.** *See United States v. Rolande–Gabriel*, 938 F.2d 1231 (11th Cir.1991) (the court held that the weight of the unusable non-drug liquid in which the cocaine was found should not have been used in calculating the base offense level).

The Supreme Court, in *Chapman*, specifically stated:

> Congress adopted a *market-oriented approach* to punish drug-trafficking, under which the total quantity of *what is distributed*, rather than the amount of pure drug involved, is used to determine the length of sentence.[11]

Although the Supreme Court probably did not contemplate the astounding facts found here,[12] their intent was sufficiently evident in reasoning that:

> LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel or sugar cube carrying LSD can be and often is ingested with the drug.... The term ["mixture"] does not include LSD in a bottle, or LSD in a car, because the drug is easily distinguished from, and separated from, such a 'container.'[13]

The suitcases in this case were more like traditional containers than ingestible carriers. The two suitcases were black in color and made of fiberglass, each weighing about nine kilograms, or approximately 18 pounds, when empty. The controlled substance was separated from the suitcase fabric, first, by physically removing all suitcase attachments resulting in "net weights" of 6.9 and 7.15 kilograms, and, second, via various chemical processes.[14]

The cocaine was not usable as long as it was mixed with the fiberglass suitcase material. It could not be swallowed, snorted or otherwise absorbed into the body. Further, the record does not show that there was any likelihood that the fiberglass and cocaine mixture would be sold or that it was even marketable on the retail or wholesale cocaine market, either prior to or after the chemical extraction by DEA Chemist Vallejo. In fact, it is for these very reasons that Chemist Vallejo first removed the suitcases' metal frames before determining the "net weight" of the mixture.[15] Similarly, all other suitcase materials should have been separated from the cocaine before weighing the mixture.

Because sentences are fixed largely by the weight of the drug sold or used, it makes no physical or legal sense to permit non-usable carrier mediums to play such a determining role in denying a person of his liberty. To the contrary, this is more than a simple matter of chemical solutions and resulting mixtures. Here, using the weight of the entire fiberglass mixture in-

---

**11.** *Id.* 111 S.Ct. at 1926 (emphasis added).

**12.** The court even recognized that "[w]hile hypothetical cases can be imagined involving heavy carriers and very little LSD, those cases are of no import in considering a claim by persons such as petitioners, who used a standard LSD carrier." *Id.* 111 S.Ct. at 1928.

**13.** *Id.* 111 S.Ct. at 1926.

**14.** Specifically, DEA Chemist Vallejo testified that in order to separate the controlled substance from the fiberglass suitcase material, she performed the following procedure on the two suitcases:

1) Vallejo weighed the suitcases, including their metal frames, handles, wheels and any labels affixed to the suitcase, and arrived at "gross weights" of 8.75 and 9 kilograms;

2) Vallejo disassembled the suitcases, by removing the frames, wheels, handles, and rubber linings, and peeling off any labels. The remaining suitcase bodies were weighed and calculated to have "net weights" of 6.9 and 7.15 kilograms, totalling 14.05 kilograms. Vallejo next cut the suitcase sides into several sections, creating a kind of "sawdust;"

3) After collecting the "sawdust" mixture, Vallejo extracted the controlled substance from the mixture by combining it with a chloroform solvent, which separated most of the fiberglass resin from the controlled substance. She then used methanol and ether to clean and crystallize the substance. After several tests using the gas chromatograph and mass spectrometer, Vallejo arrived at respective purities of 28% and 9.3% for the mixture. Multiplying the "net weights" of 6.9 and 7.15 kilograms by 28% and 9.3%, respectively, Vallejo arrived at a second "net weight" for each suitcase, this time representing the weight of the pure cocaine: 1932 grams for the first suitcase and 665 grams for the second suitcase, totalling 2597 grams. *See* Trial Tr. at 104–14.

**15.** Under *Mahecha–Onofre, see* n. 1, the resulting mix of cocaine and fiberglass material was not usable in any way as a narcotic. One wonders why, out of some notion of fairness, the weight of the metal frames was excluded in calculating "net weight." The only distinguishing factor between the fiberglass and the metal seems to be that the metal is non-chewable.

creased Lopez–Gil's sentence by more than five years.[16] As have the Sixth and Eleventh Circuits, I would conclude that the total weight of the drug mixture should be counted for sentencing purposes, only when the total mixture is in usable, distributive form, i.e., when it is capable of being smoked, inhaled or otherwise swallowed or consumed.

### Cocaine, Cocaine Base & Crack Legal or Chemical Problem

During the sentencing phase of the trial, DEA Chemist Vallejo identified the controlled substance as cocaine base. She also testified that the substance "was not crack." (Sent. Tr. at 5). Finding this testimony contradictory, the court first characterizes the question of "what is cocaine base" as a legal one, and then finds as a matter of law that cocaine base equals crack cocaine.

Neither the statute, 21 U.S.C. § 841(b), nor the Sentencing Guidelines define the term "cocaine base." Although the majority cites Shaw[17] and Barnes[18] for the proposition that cocaine base equals crack, I, like the Government, would read these cases as merely holding that cocaine base *includes* crack cocaine.

Further, this question was not a legal issue to be decided by a panel of judges, but rather a fact question for the trial judge. It was up to the trial judge to make a specific factual finding as to the contents of the drug mixture, whether it be cocaine or cocaine base. Again, whether Lopez–Gil serves an extra fourteen years in prison

turns on this determination,[19] and deserves more than blanket reliance upon what one or more appellate courts have stated, as Article III wisdom does not include fine chemical distinctions.

Because the trial court failed to make such a finding, and the court finds no fault with this procedure, I again dissent. I would remand this case to the district court to determine with such factual information as is available whether the substance was cocaine or cocaine base and for potential resentencing.

### ON PETITION FOR REHEARING
May 12, 1992.

PER CURIAM:

We make clear at the outset that this Court is divided on the following two issues crucial to the determination of Lopez–Gil's sentence: 1) as raised by Judge Brown's dissenting opinion, whether the net weight of the suitcases should have been used in calculating Lopez–Gil's sentence; and 2) as raised by the Government's petition for panel rehearing, whether the controlled substance should have been classified as "cocaine" or "cocaine base" for sentencing purposes.

### 1) *The Suitcase Issue*

With respect to issue one, "the suitcase issue," Lopez–Gil failed to request a rehearing, from either the panel or from the court en banc. Nevertheless, First Circuit rules permit its Judges or the panel to request a vote on whether to rehear a

---

**16.** The Sentencing Table used to compute criminal sentences has two primary components: (i) the Offense Level (1–43) forms the vertical axis and is determined by the kind and weight of controlled substance; and (ii) the Criminal History Category forms the horizontal axis. Points are attributed in this latter category based upon length and number of prior sentences, as well as factors such as whether the offense was committed while the defendant was on probation or escape status. The intersection of the Offense Level and Criminal History Category is the Guideline Range in months of imprisonment.

In this case, Lopez–Gil was sentenced to concurrent sentences of 292 months for each count under Offense Level 40, based upon the trial court's conclusion that the controlled substance was cocaine base and that its total weight was 14.050 kilograms. Had the trial court used only the weight of the cocaine, a total of 2597 grams,

as opposed to the entire mixture, Lopez–Gil would have been sentenced under Offense Level 38 to concurrent sentences of only 235 months, a difference of about five years.

**17.** *United States v. Shaw*, 936 F.2d 412 (9th Cir.1991).

**18.** *United States v. Barnes*, 890 F.2d 545 (1st Cir.1989).

**19.** Using a total weight of 14.050 kilograms, the weight that the majority accepts as correct, Lopez–Gil faces concurrent sentences of 292 months under Offense Level 40, assuming the substance is cocaine base. If the substance can be categorized as cocaine, however, Lopez–Gil will be sentenced for only 121 months under Offense Level 32.

decision en banc. Because a majority of the Judges declined to rehear en banc "the suitcase issue," Judge Brown respectfully dissents.[†] The district court included the net weight of the suitcases in its calculation of Lopez–Gil's sentence. Judge Brown is of the conviction that the weight of foreign materials, such as fiberglass suitcase material, should not be counted for sentencing purposes unless they are usable and consumable.

### 2) *Cocaine Base or Cocaine?*

■ On the second issue, the Government filed a Petition for Panel Rehearing, which the panel now addresses. The sole question on rehearing is whether Lopez–Gil's sentence should be computed by classifying the controlled substance as "cocaine" or "cocaine base." We held on appeal that the district court erred in using cocaine base as the standard for sentencing.[2] We GRANT the Government's Petition for Panel Rehearing and REMAND to the district court to specifically find whether the controlled substance was in fact cocaine or cocaine base.

Lopez–Gil was convicted by a jury of 1) possession, with intent to distribute, of approximately 14 kilograms of cocaine; 2) of importation of cocaine into the United States; and 3) of possession of cocaine on board an aircraft. The district court sentenced Lopez–Gil under Offense Level 40 to concurrent sentences of 292 months of confinement and five years of supervised release as to each of the two counts. This sentence was based upon the court's conclusion that the controlled substance was cocaine base. We modified the sentence on appeal, holding that the term "cocaine base" means only crack cocaine. Based upon this legal determination, we found that since the expert testimony at the sentencing phase showed that the controlled substance clearly was not crack, the substance should have been classified instead as cocaine and not "cocaine base." Under our modification, based on our determination that the substance was cocaine, Lopez–

Gil faced concurrent sentences of only 121 months of confinement as to each count under Offense Level 32. This resulted in a striking 18–year reduction in Lopez–Gil's sentence.

The controversy surrounding the classification of the controlled substance centers on DEA Chemist Vallejo's testimony at the sentencing phase of the trial. After performing a chemical analysis, Vallejo testified at trial that she found "cocaine as the base." During the pre-sentencing hearing, Vallejo also testified that the cocaine base was not crack:

Q Miss Vallejo, you were the person that analyzed the narcotic drug found in the luggage?

A Yes, sir.

Q And in the report that you submitted at the time of the trial you stated there that it was cocaine base, is that correct?

A Yes....

Q Miss Vallejo, was the cocaine base found in the luggage crack?

A No, it was in the state it was received, no. It was not crack.

Q Most or some of the analysis made of cocaine base could be crack?

A Yes.

Q And in this case it was not?

A No.

The Court: It was not crack?

A It was not crack.

We reiterate that neither the statute, 21 U.S.C. § 841(b), nor the Sentencing Guidelines define the term "cocaine base." The legislative history of the statute shows that Congress meant "cocaine freebase" when using the term "cocaine base." Although we continue to believe that Congress indeed was concerned primarily with the crack epidemic in enacting the legislation, the Government now persuades us that it does not necessarily follow that the term "cocaine base" includes *only* crack cocaine.

Judges have much to learn about various drug forms and their new technologies, which are most certainly developing everyday. The fact that we are not aware of the

---

† Because Judge Brown sits only by designation, he, of course, is without power to either request or cast a vote for en banc review, and clearly could never participate in the en banc decision.

2. *U.S. v. Lopez–Gil*, 965 F.2d 1124 (1st Cir.1992).

existence of a new derivative form of cocaine base that is separate and distinct from crack, does not mean that there is no such substance. District judges are forced to rely on the expert testimony of chemists who specialize in drug analysis in order to determine the identity of a substance.

In this instance, Chemist Vallejo clearly testified that although the substance was not crack, it was indeed cocaine base. This convincing testimony formed the basis for the district court's sentence. Because the court did not specifically find that the controlled substance was cocaine base, however, we remand this issue to the district court to make the appropriate finding.

Accordingly, (1) we GRANT the Government's Petition for Panel Reconsideration only with respect to Part 2 published at 1129; (2) WITHDRAW Part 2 of this opinion; and (3) REMAND this issue to the district court for further findings.[3]

JOHN R. BROWN, Senior Circuit Judge, dissenting:

I strongly dissent to the full court's refusal to rehear en banc "the suitcase issue." Although there now may be some sentiment in this court that the precedent-setting *Mahecha–Onofre*[4] was incorrectly decided, the votes needed for the court to rehear this issue en banc are still lacking.

In my small voice, I again dissent to the failure of the First Circuit to vote to overturn its prior holding and follow the lead of the Sixth and Eleventh Circuits.[5] Carrier mediums that can not be digested, inhaled or otherwise consumed, but still significantly increase the weight of the controlled substance, have no place in drastically affecting the number of years a person must serve in prison.

In this case, if upon remand the trial court finds that the substance was cocaine base, Lopez–Gil will spend approximately five[6] more years in prison as a result of including the weight of the unusable, nonconsumable suitcase material. Similarly, if the trial court finds that the substance was cocaine, Lopez–Gil will face about three and one-half[7] more years of imprisonment if the weight of the suitcase is included.

Unfortunately, First Circuit Judges passively continue to accept the validity of *Mahecha–Onofre*, while district courts continue to impose longer confinements for which no real right of appeal exists since, as here, the court will find its opinion bound by *Mahecha–Onofre*. No longer should the court sit idly by when three, five or possibly many more years of a man's liberty are at stake on the basis of a decision which is so materially and legally unsupported.

BOWNES, Senior Circuit Judge, dissenting:

I continue to adhere to the reasoning I set forth in detail in the original panel opinion on the "crack" issue.

---

**3.** Because Judge Brown concurs fully in the decision to grant the Government's Petition for Panel Rehearing and in its determination that this issue should be remanded in order for the district court to find whether the substance was cocaine or cocaine base, his dissent solely with respect to this issue is also WITHDRAWN.

**4.** In *United States v. Mahecha–Onofre*, 936 F.2d 623 (1st Cir.1991), we interpreted *Chapman v. United States*, — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), to require that the weight of the suitcase material be included for sentencing purposes.

**5.** Both the Sixth and Eleventh Circuits have held that the unusable parts of the drug mixture should not be counted in determining a defendant's sentence. *United States v. Jennings & Stepp*, 945 F.2d 129 (6th Cir.1991); *United States*

*v. Rolande–Gabriel*, 938 F.2d 1231 (11th Cir. 1991).

**6.** Given a weight of 14.05 kilograms of cocaine base, which includes the suitcase material, the corresponding Offense Level is 40 resulting in a minimum sentence of 292 months. If, however, only the weight of the cocaine base is used, 2597 grams, the Offense Level is 38 resulting in a minimum sentence of 235 months, a difference of about five years.

**7.** A weight of 14.05 kilograms of cocaine corresponds to a minimum sentence of 121 months, while a weight of 2597 grams of cocaine results in a minimum sentence of 78 months, roughly a difference of three and one-half years.