UNITED STATES of America, Plaintiff

v.

Radelle HUBBARD, Defendant

No. 03–CR–30021–MAP.

United States District Court,
D. Massachusetts.

April 25, 2005.

Todd E. Newhouse, United States Attorney's Office, Springfield, MA, for USA, Plaintiff.

Terrence M. Dunphy, Fallon, Sullivan, Dunphy & Mulvaney, Springfield, MA, for Radelle Hubbard (1), Defendant.

## SUPPLEMENTAL STATEMENT OF REASONS

PONSOR, District Judge.

On April 13, 2005, the court sentenced the defendant to 108 months in the custody of the Bureau of Prisons with ten years of supervised release to follow under certain conditions. The court's reasons for imposing this sentence were set forth in detail orally at the sentencing hearing. This memorandum will summarize them.

Preliminarily, it is important to note that the defendant never at any point during the plea proceeding admitted to having committed any crime involving the distribution of cocaine base in the form of so-called "crack" cocaine. A 1993 amendment to the Sentencing Guidelines makes this omission crucial. For the past twelve years, at least for purposes of the Guidelines, forms of cocaine base other than crack have been treated as ordinary cocaine, *i.e.* without the enhanced penalties associated with crack. *See,* U.S.S.G.App. C, Amend. 487 (1993).

The government has argued that, while the absence of any plea to a crime involving the crack form of cocaine base might

be significant for purposes of the Sentencing Guidelines, this deficiency should not affect application of the statutory minimum mandatory sentence pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), which calls for a mandatory ten-year sentence (enhanced in this case to a mandatory life sentence due to the defendant's prior convictions for felony drug offenses) for a crime involving 50 grams or more of "cocaine base."

For the reasons set forth in the Supplemental Statement of Reasons issued on March 14, 2005 in the case of *United States of America v. Gregory Thomas*, 03–CR–30033–MAP, this court is of the opinion that the First Circuit, if squarely presented with the issue, will agree with the solid majority of circuits that have concluded that the narrower definition of "cocaine base" applicable since 1993 to the Sentencing Guidelines applies equally to the statutes governing minimum mandatory sentences. It is unreasonable to suggest that Congress, in situations where the consequences are so grave, could have intended one definition of cocaine base to apply for Sentencing Guidelines purposes and another to apply to sentences governed by statute. Moreover, it can hardly be denied that the severely enhanced penalties set forth in the statute for "cocaine base" were enacted as a response to a plague of *crack* distribution; they were not intended to address other, less harmful forms of cocaine base.

In reaching this conclusion, the court acknowledges that the Court of Appeals in *United States v. Richardson*, 225 F.3d 46 (1st Cir.2000), appears, without extended discussion, to hold to the contrary. That decision, however, relies on an earlier First Circuit decision, *United States v. Lopez–Gil*, 965 F.2d 1124, 1134 (1992), which predates the 1993 amendment to the Guidelines, and does not cite or address the numerous cases in other circuits holding to the contrary after 1993.

Where the consequences are so profound—here, a excessive sentence of life in prison—the First Circuit, in my opinion, will wish to revisit this issue, adequately briefed and in the center of the radar screen. A copy of this court's *Thomas* Statement is appended to this memorandum as Exhibit A.

Given that the defendant did not plead to any crime involving crack cocaine, and the court found that no statutory minimum mandatory sentence applied, the court proceeded to calculate the applicable advisory guideline range.

The Sentencing Guidelines place the defendant, given his prior record, in the category of a career offender. Since his crime of offense carries a thirty-year maximum, he occupies a preliminary offense level 34. With a deduction of three points for acceptance of responsibility, the offense level drops to 31. Since the defendant occupies criminal history category VI, the advisory Sentencing Guidelines range is 188–235 months.

Even in a mandatory guidelines system, the court would depart downward to a sentence of 108 months, based upon the defendant's diminished capacity, as set forth in the report of Dr. Howard Lester. The defendant's childhood presents one of the most appallingly traumatic scenes the court has encountered in over twenty years on the bench.

The facts, greatly simplified, are as follows. At age five defendant was sexually molested. When he reported the attack to his oldest sister, and his sister confronted the molester, the attacker responded by fire bombing the defendant's apartment. Three of the defendant's siblings, including a six-month old baby, died in the resulting fire, under the eyes of the defendant. In

response to this horror, defendant's mother disintegrated emotionally, descending into alcoholism and drug abuse, with the result that from the age of ten the defendant was essentially on his own. As Dr. Lester's report indicates, the nightmare of the fire and the defendant's effective abandonment were accentuated by the defendant's guilty knowledge that if he had not reported the molestation his siblings would still be living. The depression and post-traumatic disorder prompted in childhood shaped the path that led defendant to this courtroom. In other words, the defendant's severely diminished capacity directly precipitated his life on the streets and his conduct as a career offender. Under these circumstances, even in a mandatory guidelines regime, the court would be justified in departing below the applicable range.

Assuming that the court is incorrect, either in the fact or the extent of the downward departure, it would still find the same sentence to be reasonable in light of the criteria set forth in 18 U.S.C. § 3553. In addition to the defendant's diminished capacity, the court would consider also the cooperation that the defendant actively offered to the government, which led to the successful prosecution of at least one other person before this court and the recovery of at least one illegal firearm. The government has taken issue with the extent of assistance claimed by the defendant, but it has not denied that at least some assistance was offered and received. The possibility that defendant's cooperation and assistance may not have been sufficient to justify a downward departure under the old mandatory guidelines system—a complicated point that the court will address below—does not foreclose the court from considering this factor under § 3553. *See, United States v. Gorsuch,* 404 F.3d 543, 545–46 (1st Cir.2005) (in weighing statutory factors certain portions of the record

"may be more relevant than under the pre-*Booker* regime of mandatory guidelines.")

Before leaving the issue of the defendant's substantial assistance and entitlement to consideration from the government, some discussion is necessary. At the sentencing hearing, defendant's counsel argued vigorously that the government had failed to live up to its commitment to recognize defendant's substantial assistance in at least one of several possible ways. The court rejected these arguments, finding that the defendant had failed to show the requisite absence of good faith on the part of the government to permit the court to compel action favorable to the defendant.

In retrospect, the court's rejection of the defendant's argument may have been hasty, for two reasons.

First, the complex issue of the government's compliance with the plea agreement was rendered moot by the court's decision to depart downward on other grounds. Even if the government had taken some action to reward the defendant for his substantial assistance, the court still would not have imposed a sentence any lower than 108 months. Given this fact, a scrupulous examination of the government's obligation to provide the court with an alternate basis to depart downward was unnecessary.

Second, as a matter of law, the defendant's argument has more weight than the court realized. Paragraph 8(a) of the plea agreement sets forth the "Terms of Cooperation," specifying the defendant's obligation to provide complete and truthful information, not withhold any information, not attempt to protect anyone through false information, or the like. At hearing, the government did not allege that defendant failed to satisfy any of these terms.

Paragraph 8(b) of the plea agreement sets forth the government's obligations. The very first sentence of this provision states:

In the event that Defendant provides substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before the time of sentencing, the U.S. Attorney will dismiss the information filed pursuant to 21 U.S.C. § 851, and/or make a motion under U.S.S.G. § 5K1.1, and/or if the U.S. Attorney determines it to be appropriate, make a motion under 18 U.S.C. § 3553(e) so that the sentencing court may impose a sentence below that which otherwise would be required under the Sentencing Guidelines and the relevant statutes.

Plea Agreement, at 9.

At the sentencing hearing the government appeared to concede (while contesting other claims of assistance) that the defendant did, in fact, provide substantial assistance in the investigation and prosecution of "another person," Ronald Shaver, who subsequently pled guilty to serious drug offenses before this court. Thus, reading this term of the plea agreement literally, defendant has at least a colorable argument that he performed his side of the bargain, and the government failed to perform its side.

Admittedly, the sentence following the extract quoted above appears to give the U.S. Attorney complete discretion "not subject to appeal or review" to decide whether assistance has been substantial. But the collision between the explicit promise that the government appears to make in the first sentence with the arguable withdrawal of that promise in the sentence immediately following would, but for mootness, have persuaded the court to consider more carefully whether the gov-

ernment had performed "in good faith the discretionary obligations it affirmatively [undertook] in a plea agreement." *United States v. Alegria*, 192 F.3d 179, 187 (1st Cir.1999).

In making this analysis, the court would not be limited, post-*Booker*, to the narrow framework of principles set forth in case law construing U.S.S.G. § 5K1.1. A portion of the government's undertaking in this case was that it would consider at least two other forms of potential consideration: a motion to dismiss the information under 21 U.S.C. § 851 and a motion to permit departure pursuant to 18 U.S.C. § 3553. The court's power to enforce the government's agreement with regard to these non-Guidelines remedies would have been significantly broader than permitted under the strict terms of § 5K1.1.

A final point would strengthen the defendant's argument that he is entitled to enforcement of the substantial assistance provisions of the plea agreement. At the initial sentencing hearing, the court inquired whether, pursuant to the plea agreement, the government would be making any sort of motion to recognize the defendant's cooperation. Government counsel's response to this inquiry was, in essence, "It depends." The implication of this comment appeared to be that the government wished to confirm what the court's handling of the issue of the possible application of the statutory minimum mandatory sentence would be before revealing whether it would be filing any motion that might benefit the defendant. As soon as it was clear that the court would not be applying a statutory minimum mandatory sentence (for the reasons stated above), government counsel indicated no motion would be filed.

Putting aside the troubling question of whether it is proper to allow the government to keep its hand concealed until the

court's cards are on the table, the defendant would have been able to argue, had the point not been moot, that substantial assistance does not acquire or lose its "substantial-ness" depending on the sentencing approach taken by the court. Put differently, a change of tune depending on whether the likely sentence without government assistance would be life imprisonment, or only 188 months, would provide at least an argument supporting a lack of good faith.

As noted, the manifold contours of the potential arguments regarding the government's good faith in upholding its end of the plea agreement in this case were unexplored by this court at sentencing, largely because of the existence of other legitimate grounds for departure. If a reviewing court should find these grounds inadequate, or if it should find that a statutory minimum mandatory sentence should be imposed in this case, a remand to ventilate these issues at a re-sentencing hearing might be considered.[1]

Exiting the parenthesis devoted to the vexed, and moot, issue of the plea agreement, and returning to the main line of analysis, the court find that the 108-month sentence fully satisfies the criteria set forth at 18 U.S.C. § 3553. First, a nine-year prison term does adequately address the nature and circumstances of the serious crimes committed by the defendant. Second, the sentence takes into consideration the defendant's background, and particularly his devastatingly traumatic childhood and the ongoing psychological problems and diminished capacity result-

ing from that trauma. The sentence promotes respect for the law and will act as a strong deterrent to others tempted to commit this crime. Finally, the sentence will offer the defendant appropriate opportunities for rehabilitation to insure that when he is released he will take his place as a responsible citizen in our society.

Exhibit A

*SUPPLEMENTAL STATEMENT OF REASONS*

March 14, 2005

On May 21, 2004, the defendant was found guilty after a jury trial of two counts of possession with intent to distribute, and distribution of, cocaine base. The charges arose from sales of cocaine base on January 16, 2003 for $100 and on January 23, 2003 for $350.

On February 25, 2004, the court sentenced the defendant to 262 months to the custody of the Bureau of Prisons, with six years of supervised release to follow.[2] The purpose of this memorandum is to detail the justification for the court's conclusion that this sentence is reasonable, based upon the factors set forth in 18 U.S.C. § 3553(a) and the now-advisory Sentencing Guidelines.

As the first step in crafting the sentence, the court looked to the Guidelines, which required a preliminary assessment of the evidence bearing on the identity of the controlled substance at issue. Under the Sentencing Guidelines, the penalties for crimes relating to a specific sub-type of

---

1. If the court has correctly drawn the inference that the government might, for example, have dismissed the § 851 information if the defendant were facing a statutory minimum mandatory sentence, then a failure to remand might risk a ghastly miscarriage a justice. Defendant could find himself facing a mandatory life sentence that even the government

did not intend, rather than a mandatory sentence of twenty years.

2. Sentencing was postponed several times to allow counsel to brief the issues raised, first, by the Supreme Court's *Blakely* decision and, later, by its decision in *Booker*.

cocaine, so-called "crack" cocaine, are one hundred times greater than the penalties for crimes relating to other forms of cocaine.

Some confusion existed prior to 1993 as to the Guidelines' intent with regard to a larger sub-category of cocaine, known as cocaine base, of which crack cocaine is one variety. However, since November 1, 1993, it has been clear that, where the Guidelines refer to cocaine base for purposes of the enhanced penalty, they are referring *only* to the sub-type of cocaine base known as crack. Pursuant to the 1993 amendment "forms of cocaine base other than crack ... will be treated as cocaine"—*i.e.*, without the enhanced penalties. *See* U.S.S.G.App. C., Amend. 487 (1993).

In this case, both the government and the court exhibited a lack of precision with regard to the crucial distinction between cocaine base generally and the particular sub-form of cocaine base, crack cocaine, to which enhanced penalties apply. Thus, for example, the indictment referred only to "cocaine base," failing to specify in the charging document that the government was seeking a conviction for a specific type of cocaine base, crack. At trial, the government's chemist confirmed no more than that the substance in question was cocaine base.[3] The only evidence that attempted to locate the substance at issue within the narrower category of *crack* cocaine was the testimony of one FBI investigator, who stated that in his opinion the substance in question was crack cocaine.

The court, as noted, contributed to the imprecision. Its poorly worded verdict form directed the jury to consider whether the government had proved the defendant guilty beyond a reasonable doubt "of possession with intent to distribute and distribution of cocaine base, sometimes known as 'crack cocaine'...." This ambiguous wording permitted the jury to find the defendant guilty of distribution of cocaine base but did not require it necessarily to address the more specific question of whether the substance actually distributed by the defendant on the two occasions charged by the government was, in fact, cocaine base in the form of crack. For all that can be known for certain from the special verdict form, the jury might have simply intended to find the defendant guilty of crimes involving cocaine base.

The government points to two Court of Appeals decisions, *United States v. Richardson*, 225 F.3d 46 (1st Cir.2000) and *United States v. Robinson*, 144 F.3d 104 (1st Cir.1998), as approving the district court's reliance on an expert chemist's finding of cocaine base, supplemented by an experienced law enforcement officer's identification of the substance as crack, as sufficient to buttress the judge's conclusion that the substance in question was actually crack. The government's point is correct, to some extent, but ignores some differences between the facts of those cases and the record now before this court. More importantly, the government's argument overlooks the procedural context in which the First Circuit's opinions arose.

In *Robinson*, the court at sentencing had before it not only the chemist's and the investigator's testimony, but the defendant's own admission that the substance found in his pocket was "rock," a common street term for crack. *See, Robinson*, 144 F.3d at 109. In *Richardson*, the chemist noted the presence of sodium bicarbonate

---

3. Indeed, chemical differentiation between cocaine base generally and the crack form of cocaine base is impossible, since "crack and all other forms of cocaine base are identical at the molecular level." *United States v. Robinson*, 144 F.3d 104, 109 (1st Cir.1998).

in some of the samples, an admixture which the Guidelines themselves specifically identify as one signature for crack. In addition, three different law enforcement agents offered their opinions that the substance was crack. *See, Richardson,* 225 F.3d at 49–50.

In this case, the government's chemist did not note the presence of sodium bicarbonate, no admission was made by the defendant that identified the substance as crack, and only one law enforcement officer testified that, in his opinion, the substance in question constituted the crack form of cocaine base. Certainly on this basis it would be impossible to conclude that the jury here *must* have found that the substance the defendant distributed was crack. Neither *Richardson* nor *Robinson* suggest any such inevitable conclusion, even with the greater evidence present in those two cases.

More significantly, the limited issue presented to the Court of Appeals in *Richardson* and *Robinson* was whether it was "clear error" for the sentencing judge to rely on the quantum of evidence available at the sentencing in making the decision that the guidelines for crack applied. While the First Circuit found in those two instances that the evidence was enough to insulate the judge's sentence from any claim of clear error, nothing in either decision suggested that the quantum of evidence would have *required* the judge to find the substances were crack, or that it would in any way have constituted error for the judge to have made a contrary finding.

The record in this case is not sufficiently clear for the court to conclude that the jury found beyond a reasonable doubt that this defendant was guilty of possessing with intent to distribute and distributing *crack* cocaine versus generic cocaine base.

It flows from this that, to the extent that a jury finding beyond a reasonable doubt is required in order to measure the application of the advisory Guidelines, then the necessary finding simply has not been made.

To the extent that it now falls within the court's discretion to make its own decision with regard to whether the substance in question constituted crack cocaine, this court finds that the record lacks sufficient evidence to permit such a finding. To repeat, in the right circumstances, testimony of a chemist identifying the substance as cocaine base plus testimony of an agent giving his opinion that the substance constitutes the sub-species of cocaine base known as crack, may *permit* the finding the government seeks; it does not *mandate* it. Where the impact of a finding that crack cocaine is involved has such an extraordinarily powerful effect on the potential sentence, this court may be justified in requiring more. Additional forms of proof may include: presence of sodium bicarbonate or some other common chemical component signifying crack; conversations before, during or after the sale signifying that the defendant knew that what he was selling was crack; or testimony from more than one witness regarding the unique appearance of the substance in question indicating it was crack.

As this case now stands, whether the court must rely upon the jury's finding, or may make the factual finding itself, the evidence was insufficient to justify a conclusion that crack cocaine was involved in this case. Thus, in crafting the sentence, the court will use the Sentencing Guidelines governing forms of cocaine that are not crack.

As it happens, the impact of this finding upon the sentence is not as powerful in this case as it sometimes is. The reason for this is that the defendant, due to his

extensive criminal history, qualifies as a so-called "career offender." Under the career offender provisions of the Sentencing Guidelines, calculation of the potential penalty for possession with intent to distribute more than five grams of non-crack cocaine (in view of the fact that the defendant has at least one prior felony drug conviction), begins at an offense level 34 and Criminal History Category VI, generating a Sentencing Guidelines range of 262 to 327 months. Assuming the amount of the substance in question had been proven beyond a reasonable doubt to be crack cocaine, the Sentencing Guidelines range would have been 360 months to life.[4]

A final issue needs to be addressed, which is the impact of the statutory minimum mandatory sentence here under 21 U.S.C. § 841(b)(1)(B)(iii). This statute prescribes a minimum mandatory sentence of five years and a maximum sentence of forty years for crimes involving five grams or more of "cocaine base." The statute makes no reference to the "crack" subtype, but appears to apply to *any* form of cocaine base. When a defendant, such as the defendant here, has at least one prior conviction for a felony drug offense, the minimum mandatory sentence doubles to ten years and the maximum increases to life. Assuming this statute controlled the sentence, and applied to all forms of cocaine base, the potential life sentence, combined with the defendant's career offender status, would generate a Guidelines sentencing range of 360 months to life.

The question of whether the federal sentencing scheme harbors two definitions of cocaine base—one in the Guidelines limited to crack cocaine, and the other in the statute extending to all forms of cocaine base—has split the courts of appeals. The Fourth, Seventh, Eighth and Eleventh Circuits have held that the reference to "cocaine base" in § 841 should be construed the same as it is in the Guidelines, *i.e.*, covering *only* the crack form of cocaine base. The Second and Third Circuits have found that the definition of cocaine base is broader in the statute than in the Guidelines. *Compare United States v. Booker*, 70 F.3d 488, 494 (7th Cir.1995); *United States v. Jackson*, 64 F.3d 1213, 1219 (8th Cir.1995); *United States v. Fisher*, 58 F.3d 96, 99 (4th Cir.1995), and *United States v. Munoz–Realpe*, 21 F.3d 375, 377–78 (11th Cir.1994) *with United States v. Barbosa*, 271 F.3d 438, 467 (3d Cir.2001), and *United States v. Jackson*, 59 F.3d 1421, 1422–24 (2d Cir.1995).

The First Circuit in *United States v. Lopez–Gil*, 965 F.2d 1124, 1134 (1st Cir. 1992), held prior to the 1993 amendment to the Guidelines that the reference to cocaine base in the statute extended to all forms of cocaine base. Five years ago, citing *Lopez–Gil* but without discussion of the circuit conflict subsequent to 1993, the First Circuit appeared again to endorse a construction of § 841 that would extend to all forms of cocaine base, not simply crack. *See United States v. Richardson*, 225 F.3d 46, 49–50 (1st Cir.2000).

The absence in *Richardson* of any discussion of the evolution of the case law

---

4. The problem of the identification of the drug in question that is bedeviling this case may be fairly easily avoided in the future. The government has the power to identify in the indictment the substance in question specifically as the crack form of cocaine base. The court, for its part, will in future craft its special verdict form in such a way as to require the jury explicitly to make the finding, in order to return a conviction, that the substance in question has been proved beyond a reasonable doubt to be crack cocaine, without ambiguity.

after the 1993 amendment to the Sentencing Guidelines strongly suggests that the question of the proper construction of § 841 was not squarely before the First Circuit in *Richardson* and therefore was not considered. In my opinion, if directly confronted with the issue, the First Circuit would agree with the Eleventh Circuit that there is no reason "to assume that Congress meant for 'cocaine base' to have more than one definition" and that its construction of the term in the Guidelines was intended to limit the reach of the statute as well. *See, Munoz–Realpe* at 21 F.3d at 378.

Assuming that my assessment of the First Circuit's likely construction of § 841 is incorrect—and I recognize that my position is debatable—and accepting that therefore the advisory Guidelines would call for a sentence in the range of 360 months to life, it is still my opinion that in this particular case, taking the Guidelines into consideration and applying the factors set forth in 18 U.S.C. § 3553(a), a sentence of 262 months is reasonable, for the following reasons.

Looking at the nature and circumstances of the specific offenses—two relatively small hand-to-hand sales—no one could reasonably describe a sentence of nearly twenty-two years in prison as anything but severe. The heavy penalty imposed here is justified mainly by the history and characteristics of the defendant, which demonstrate a marked propensity for repeated, serious criminal behavior.

The picture also includes, however, an individual who was abandoned by his father, whose mother died when he was still a child, and who had no siblings or family other than an aunt. His current family has exhibited a strong attachment to him and has demonstrated this through letters submitted on his behalf, and the defendant himself showed an extraordinary degree of contrition at sentencing.

While a very long sentence is appropriate, an essentially life-extinguishing sentence in these circumstances is not reasonable. Defendant, at the time of his release in his late fifties or early sixties, will offer no danger to the community and may have a chance to enjoy his remaining years with his loved ones. The lengthy period of supervised release will also serve to insure that the defendant will offer no risk of any return to criminal conduct.

The sentence promotes respect for the law, it provides more than adequate deterrence, and it insures that the public will be protected from further crimes by this defendant. It will also allow the defendant to take the opportunity to participate in training programs while incarcerated and to address his severe marijuana addiction. In sum, in light of all these factors, the sentence of 262 months with a supervised released term of six years is reasonable.[5]

---

5. This court's decision that the career offender portions of the Guidelines apply does not appear to collide with the Supreme Court's decision in *Shepard v. United States*, 544 U.S. ——, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), handed down ten days after this defendant's sentencing. Mr. Thomas's record included five prior offenses (four felony drug convictions and one attempted robbery felony conviction) that constituted, without any ambiguity or necessity for judicial fact finding, predicate convictions to support the career offender designation. Only two are required. Of course, the court's decision to take guidance from the career offender provisions of the Sentencing Guidelines has been predicated on the continued viability of the Supreme Court's opinion in *Almendarez–Torres v. Unit-*

ed States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). If this decision is overturned, as Justice Thomas predicted in *Shepard* it would be, then this court's decision to look to the career offender portions of the Guidelines for guidance in crafting the sentence may have been improper. If reference to the career offender guidelines by this court is found on appeal to be improper, then resentencing would be required. This court would probably not have imposed a sentence of two hundred and sixty-two months on the defendant, except for the advisory impact of the Sentencing Guidelines as they have been calculated by the court, including the career offender provisions.