**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ERIC ALAN MAYO,
*Defendant-Appellant.*

No. 04-10076

D.C. No.
CR-02-00381-EJG

OPINION

Appeal from the United States District Court
for the Eastern District of California
Edward J. Garcia, District Judge, Presiding

Argued and Submitted
November 4, 2004—San Francisco, California

Filed January 14, 2005

Before: William C. Canby, Jr., Pamela Ann Rymer, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Canby

## COUNSEL

Tim Warriner, Sacramento, California, for the appellant.

Norman Y. Wong, Assistant United States Attorney, Sacramento, California, for the appellee.

## OPINION

CANBY, Circuit Judge.

Eric Mayo appeals the district court's denial of his motion to suppress evidence found in a search of his vehicle. While

responding to a call about suspicious narcotics activity, officers arrested Mayo for a felony violation of California's vehicle code. The officers searched Mayo's car incident to this arrest, finding bags of stolen mail. Mayo seeks to suppress this evidence on the grounds that officers: (1) lacked reasonable suspicion to detain him, (2) unreasonably broadened the length and scope of their investigation during his detention, (3) lacked probable cause to arrest him on the vehicle code violation, and (4) expanded the scope of the search incident to arrest beyond constitutional limits when they searched the hatchback area of his car. We reject all four claims, and affirm the judgment of the district court. In doing so, we join other circuits in ruling that, for purposes of an automobile search incident to arrest, officers may search the cargo area behind the rear seat of a hatchback vehicle.

### Facts

On July 16, 2002, Officer Fritts of the Stockton Police Department Narcotics Unit received a call from the manager of a Super-8 Motel.[1] The manager reported suspicious activity in the motel's parking lot. Four cars—a brown Chevrolet truck, red Pontiac Firebird, silver Dodge Caravan, and a silver Honda Civic (Mayo's car)—pulled up next to each other. The occupants got out of their cars and began talking. One of the occupants handed another a package of some sort. The driver of the truck wiped down the steering wheel and door handle of the truck with a rag or shirt, and then he walked away from the group, carrying a maroon backpack. The manager gave Officer Fritts the make and license plate number of each of the four vehicles.

---

[1]Officer Fritts knew the manager because the motel was located in an area with high narcotics activity. Officer Fritts had given the manager his phone number so that she could report any suspicious activity to him. From the record, it appears that she had called Officer Fritts at least twice before to report suspicious activity at her motel. [*Id.*]

After Officer Fritts received the call, he radioed the police dispatcher to send a patrol car to the motel to investigate suspicious activity, possibly involving narcotics. He also gave the dispatcher the descriptions of the four cars involved.[2] He told the dispatcher nothing else.

Responding to the dispatcher, Officer Golden arrived at the motel within a few minutes. By the time of his arrival, however, three of the cars had left the motel. Officer Golden spotted the fourth car, Mayo's Honda Civic, parked by the manager's office. Officer Golden pulled in behind the Civic and, as part of standard safety procedure, entered Mayo's license plate information into his computer.

Officer Golden then approached Mayo, who was standing next to his Civic. Officer Golden informed Mayo that he was investigating possible narcotics activity, and he asked Mayo for identification. Mayo handed Officer Golden his driver's license and California vehicle sales license.[3] The two then chatted informally for a minute, and Officer Golden asked Mayo whether he owned the Civic, to which Mayo responded that he was in the process of buying it from a third party. Officer Golden then took Mayo's licenses back to his patrol car to enter the information into his computer.

After returning to his patrol car, Officer Golden noticed for the first time that the Civic's registration expired in 1999, but the sticker on the plate read 2003, indicating that the sticker probably was stolen. Officer Golden walked back to Mayo and asked him about the registration. Mayo denied any knowledge of the stolen sticker on the license plate.[4]

---

[2]It is unclear from the record whether Officer Fritts relayed the license plate numbers to the dispatcher. At the least, he relayed the make and color of the vehicles.

[3]Apparently, this second license allows Mayo to resell cars in the State of California (although its precise use is unclear from the record).

[4]It is a felony to place, with intent to defraud, a false registration sticker on a California license plate. CAL. VEH. CODE § 4463.

During this time, Officer Fritts arrived to investigate narcotics activity. The motel manager told him that Mayo attempted to rent a room with a credit card in the name of Bennie Bindi. Officer Fritts approached Mayo, and Fritts, along with another narcotics officer, smelled a chemical odor commonly found in methamphetamine labs. Officer Fritts asked Mayo about the smell, and Mayo denied any knowledge of it.

Officer Fritts then asked Mayo about the credit card that he tried to use to rent the motel room. Mayo explained that Bennie Bindi authorized the use of the card because Mayo did not have enough cash to rent a room. Mayo then consented to a pat-down search. The search produced nothing suspicious, except $160.00 in twenty-dollar bills. Officer Fritts asked Mayo why he did not rent the room with this money, and Mayo responded that he wanted to rent the room for two nights.

Shortly thereafter, Bennie Bindi approached the group. Officer Fritts searched Bindi's car—the silver Dodge Caravan that the manager had seen earlier—because Bindi was on searchable probation. The search produced glass pipes for smoking methamphetamine and an altered driver's license, among other things.

Officer Fritts returned to Mayo and asked him several times to consent to a search of his vehicle. Mayo refused each time. Finally, Officer Fritts instructed Mayo that, if Mayo did not consent to the search, he would arrest Mayo for the felony vehicle registration violation. When Mayo again refused, Officer Fritts arrested him and searched his Civic incident to arrest. Officer Fritts found the stolen mail—the subject of the indictment—in bags located in both the passenger compartment and hatchback area behind the rear seat. From the slim record, it appears that Mayo could access the hatchback area from the passenger compartment. The entire event lasted

between twenty and forty minutes, from the first arrival of the police to the search of Mayo's vehicle.

### *Procedural History*

Mayo filed a motion in the district court to suppress the evidence from the search of his vehicle. After a hearing, the district judge denied the motion. Mayo then entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. The district court sentenced Mayo to six months in prison followed by three years of supervised release. Mayo appealed.[5]

### *Discussion*

## I.  REASONABLE SUSPICION TO DETAIN AND QUESTION

[1] The parties assume, as we do, that Mayo was detained at least by the time that Officer Golden took Mayo's driver's license and walked back to his patrol car with it. We conclude that this detention and its limited extension was supported by reasonable suspicion, based on specific, articulable facts, that Mayo was engaging in criminal activity. *See, e.g., United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (stating standard for reasonable suspicion).[6] Before detaining and questioning Mayo, officers knew the following: four vehicles, including Mayo's, arrived in the motel parking lot in tandem; the occupants of the vehicles gathered around the silver Dodge Caravan; the driver of the Caravan handed a package to the driver of the Firebird; the driver of the Chevrolet truck then wiped down the steering wheel and driver's side door handle with a shirt or rag, and then he walked away carrying

---

[5]The district court did not stay Mayo's sentence, so he presumably has now served the incarceration portion.

[6]We review de novo the question whether the officers had reasonable suspicion for the detention. *Michael R.*, 90 F.3d at 345-46.

a maroon backpack; and after this "transaction," the occupants (save Mayo) left the area.[7] Moreover, this meeting took place in a high-crime area and in front of a motel that hosted previous narcotics activity. *See, e.g.*, *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (noting that presence in a high—crime area is relevant to a reasonable suspicion analysis).

**[2]** We reject Mayo's contention that his detention was based on mere presence in the vicinity of suspicious activity. Mayo relies on *Ybarra v. Illinois*, 444 U.S. 85 (1980), which held that officers lacked reasonable suspicion to detain and search a defendant solely because of his presence in a tavern in which the officers suspected the bartender dealt heroin. Unlike *Ybarra*, however, Mayo clearly interacted with the other participants during the suspicious activity. The officers therefore had reasonable suspicion to detain and question Mayo when they arrived on the scene.

## II.   LENGTH AND SCOPE OF THE INVESTIGATION

Mayo further contends that his detention exceeded Fourth Amendment limitations in both duration and scope. We conclude to the contrary.[8] From the record, the maximum estimated time of the detention was forty minutes. Although the

---

[7]Officer Golden, who arrived on the scene first, did not know all of these facts. The dispatcher told him to investigate suspicious narcotics activity and gave him a description of the cars involved, including Mayo's. Collectively, however, officers knew all of these facts before Officer Golden detained Mayo and asked for his identification. *See United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986) ("We look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop.").

[8]We review de novo the question whether the initial detention exceeded its proper scope or duration. *See United States v. Garcia-Rivera*, 353 F.3d 788, 791 (9th Cir. 2003).

duration of detention bears on whether a *Terry* stop is justified, there is no strict time requirement. *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (holding that, under the circumstances, a twenty-minute detention was not too long); *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1076 (9th Cir. 2003) (noting that a *Terry* stop does not have rigid time constraints so long as the officer conducts the investigation in a diligent and reasonable fashion).

**[3]** Here, the officers conducted the investigation in a constitutional manner. The period of detention was permissibly extended because new grounds for suspicion of criminal activity continued to unfold. The officers pursued their multiple inquiries promptly as they arose: they questioned Mayo regarding their suspicion of narcotics activity; investigated the vehicle code violation; investigated Mayo's attempted use of another's credit card; investigated the connection between Mayo and Bindi, who returned to the scene while officers were questioning Mayo; searched Bindi's Dodge Caravan; and questioned Mayo about the chemical odor associated with methamphetamine. A maximum of forty minutes to pursue all of these inquiries was not unreasonable. Therefore, the *Terry* detention did not exceed constitutional limits.

## III.   PROBABLE CAUSE TO ARREST

**[4]** We also conclude that there was probable cause to support Mayo's arrest for the felony violation of California's vehicle code.[9] There is no dispute that placing a stolen registration sticker on a license plate, with intent to defraud, is a felony violation of California law. CAL. VEH. CODE § 4463. There also is no dispute that Mayo admitted that he was driving the car that day, was in the process of buying it, and had been in possession of it for the last month. These facts were

---

[9]We review de novo the district court's ruling that there was probable cause for Mayo's warrantless arrest. *See, e.g., United States v. Juvenile (RRA-A)*, 229 F.3d 737, 742 (9th Cir. 2000) (stating standard).

sufficient to establish probable cause to believe that Mayo committed or participated in the crime.

[5] Although Mayo told the officers that he was buying the car and did not realize that the sticker was on the license plate, the officers did not have to accept Mayo's version of the facts. The standard for probable cause is not so demanding. *See, e.g.*, *United States v. Hernandez*, 322 F.3d 592, 596 (9th Cir. 2003) (stating the standard for probable cause: whether, under the totality of the circumstances, a prudent officer would have believed that there was a fair probability that the suspect committed the crime). It was just as likely (if not more so) that Mayo, rather than the prior owner, placed the sticker on the plate to avoid the time and expense of registration. The arrest was not unconstitutional.[10]

## IV.   SEARCH INCIDENT TO ARREST; THE HATCHBACK AREA

[6] Mayo finally contends that officers were not entitled to search the hatchback area of his vehicle, where some of the stolen mail was found, as part of a search incident to his arrest. Our approach to this issue is informed by *New York v. Belton*, 453 U.S. 454, 460 (1981), which held that officers may conduct a search of the entire passenger compartment of a vehicle, as well as any containers within it, as an incident to the arrest of one of the vehicle's occupants. Of particular importance for our purposes is the emphasis the Court placed

---

[10]Mayo contends that he was arrested for refusing to consent to the search of his automobile. He relies on *Gasho v. United States*, 39 F.3d 1420, 1431-32 (9th Cir. 1994), which held that refusal of consent to search did not support probable cause to arrest. Here, however, the probable cause was supplied by the felonious attachment of a stolen sticker to an expired license plate. Where an arrest is supported by probable cause, a subjective intent of the officers to conduct a search is irrelevant, so long as the search is not conducted in an extraordinary manner. *See United States v. Hudson*, 100 F.3d 1409, 1416 (9th Cir. 1996). There was nothing extraordinary about the search of Mayo's vehicle.

on the need for a workable and straightforward rule to identify the area that may be searched without requiring an individualized factual inquiry into whether the arrestee likely could access the area for the purpose of grabbing a weapon or destroying evidence. *See id.* at 459-60. The Court therefore relied on the "generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].' " *Id.* at 460 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). The Court deemed it appropriate to rely on this generalization to authorize search of the entire passenger compartment "[i]n order to establish the workable rule this category of cases requires." *Id.*; *see also Thornton v. United States*, 124 S. Ct. 2127, 2132 (2004) ("The need for a clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular moment, justifies the sort of generalization which *Belton* enunciated.").

**[7]** Our task, therefore, is to determine a workable rule, consistent with the regime of *Belton*, to govern searches of the cargo area behind the rear seat of a hatchback vehicle.[11] We conclude that the hatchback area meets the criterion for automobile searches under *Belton*; it is "generally, even if not inevitably," accessible to an arrestee from the passenger area of the vehicle. 453 U.S. at 460. Contrary to Mayo's contention, the hatchback area is much more easily viewed as part of the passenger compartment than as the equivalent of a conventional vehicle trunk.[12] Accordingly, an officer conducting

[11]We recognize that recent occupants, following their arrest and restraint, are frequently in no position to gain access to any portion of the passenger compartment of the vehicle, but this fact does not preclude the application of the *Belton* rule. *See Thornton*, 124 S. Ct. at 2132. As one Justice observed, application of the rule in this context brings to mind "the mythical arrestee possessed of the skill of Houdini and the strength of Hercules." *Id.* at 2134 (Scalia, J., concurring) (internal quotation omitted).

[12]As in *Belton*, our ruling does not extend to the trunk of a vehicle. *See* 453 U.S. at 460-61 n.4.

a search incident to the arrest of an occupant of the vehicle may search the hatchback area. We adopt that workable rule for this circuit. Our decision echoes that of other circuits that have addressed comparable searches. *United States v. Caldwell*, 97 F.3d 1063, 1067 (8th Cir. 1996); *United States v. Doward*, 41 F.3d 789, 794 (1st Cir. 1994); *see also United States v. Olguin-Rivera*, 168 F.3d 1203, 1205-07 (10th Cir. 1999) (allowing search of covered cargo area of a sport utility vehicle); *United States v. Pino*, 855 F.2d 357, 364 (6th Cir. 1988) (allowing search of cargo area of mid-size station wagon).

[8] Mayo urges us to draw a distinction between covered and uncovered hatchback cargo areas. We see no principled distinction, however. A covered hatchback area is generally, if not inevitably, accessible from the passenger compartment, albeit with some difficulty in some instances. Our ruling that the hatchback area can be searched should not be clouded by the interposition of a cover, any more than it would be by the interposition of a locked container. *See Olguin-Rivera*, 168 F.3d at 1206 (citing *Belton*, 453 U.S. at 460). Thus, officers may search the hatchback cargo area "whether covered or uncovered." *Id.* at 1207.

[9] We conclude that, under *Belton* and its progeny, the officers here properly searched the entire passenger compartment of Mayo's automobile, including the hatchback cargo area, as an incident to the arrest of Mayo, a recent occupant of the vehicle.[13]

**AFFIRMED.**

---

[13]In his opening brief, Mayo contended that *Belton* did not apply because he was outside of his vehicle when the officers arrived. Subsequently, however, the Supreme Court decided *Thornton*, which held that the *Belton* rule also applied to recent occupants of the vehicle. *Thornton*, 124 S. Ct. at 2132.