# United States Court of Appeals
## For the First Circuit

No. 05-2705

UNITED STATES OF AMERICA,

Appellee,

v.

WILLARD JOHN ALLEN,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

Before

Selya and Howard, Circuit Judges,
and Smith,* District Judge.

Tina Schneider for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D.
Silsby, United States Attorney, was on brief, for appellee.

November 17, 2006

---

* Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**. Willard John Allen appeals from a judgment and sentence entered by the United States District Court for the District of Maine. After the District Court denied his motion to suppress evidence and statements, Allen was convicted by a jury of one count of conspiracy to distribute at least fifty grams of cocaine base and one count of possession with intent to distribute at least fifty grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. The District Court sentenced Allen to a 360-month term of imprisonment.[1] Allen timely appeals, challenging both his conviction and sentence. For the reasons that follow, we affirm.[2]

I. Factual and Procedural Background

We set forth the facts as supportably found by the magistrate judge. On the morning of January 4, 2004, Agents Roland Godbout and Matt Cashman, both of the Maine Drug Enforcement Agency ("MDEA"), received a tip from an informant that an individual named "Curt" was selling crack cocaine out of the Morningstar Motel on Lisbon Street in Lewiston, Maine. After surveilling the motel from across the street for a couple of hours, Agents Godbout and Cashman saw two individuals, later identified as David Moody and Jeff

---

[1]The District Court also imposed a five-year term of supervised release.

[2]This appeal comes from the judgment in a criminal case imposed by the United States District Court for the District of Maine. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291.

Dillingham, arrive at the motel in an Izusu Trooper and enter room number twelve. Approximately ten minutes later, Moody and Dillingham emerged from the room and drove off in the direction of downtown Lewiston. As the agents followed, the Trooper rapidly accelerated to speeds outside the legal limit, prompting the agents to instruct a uniformed police officer to make a traffic stop. Moody was immediately arrested for driving with a suspended license; Dillingham was detained and, after a little posturing, admitted that he had bought crack cocaine from Curt at the Morningstar Motel.

That afternoon, with Dillingham's confession in mind, Agents Greg Boucher and Barry Kelly surveilled the Morningstar with particular scrutiny on room twelve. At approximately 3 p.m., Kelly saw a white male (later identified as Allen) pull up to room twelve in an Izusu Rodeo, enter the room, and return to the Rodeo with a black male (later identified as Curtis Thurman, a.k.a "Curt"). Reilly observed each man carrying a dark-colored duffel bag. Like Moody and Dillingham earlier, the Rodeo drove out of the parking lot and headed toward downtown Lewiston. The agents followed in their unmarked vehicle and observed that the Rodeo was driving "erratically," that is, swerving, speeding, and signaling inconsistently. Based on these factors, the agents believed that Allen and Thurman were making a "heat run" by deliberately attempting to avoid police detection and surveillance. Within

approximately two minutes after leaving the motel, the agents requested that uniformed Lewiston police officers stop the Rodeo.

After effectuating the stop, the uniformed officers ordered both the driver and passenger out of the vehicle. The officers handcuffed both men and placed them in separate cruisers. At this point, Agent Godbout and Agent Kelly arrived on the scene, went to the cruiser in which Allen was placed, and read Allen his <u>Miranda</u> rights. Allen acknowledged that he understood his rights and then agreed to speak with the agents.

Agent Kelly began by asking Allen if there were any drugs in the Rodeo, to which Allen replied that he did not have any drugs but that, hypothetically speaking, if drugs were in the vehicle they would be in a black duffel bag in the back. When asked why he thought that, Allen, gesturing to a particular black duffle bag, stated that the bag was Thurman's and that Thurman had prohibited him from touching it. The agents then asked Allen for consent to search the vehicle and Allen agreed, stating, "Yeah, go ahead, I've got nothing to hide."

The agents enlisted Agent Morin to search the vehicle with his drug-detection dog. Not surprisingly, after the dog had been commanded to search for drugs it alerted to the black duffel bag in the rear of the vehicle that Allen had hypothetically singled out. The agents searched the bag and found a substance

that field-tested positive for cocaine, a receipt in Thurman's name from the Morningstar, $225 in cash, and a digital scale.

Agent Kelly then interviewed Allen back at the police station, reminded Allen of his rights, and informed him that their conversation could end at any time of Allen's choosing. Allen told Agent Kelly that he had smoked crack with Thurman several times before, but was unsure about whether Thurman was a drug dealer. Also, Allen disclosed that the duo was heading for an industrial park to "dump" one of the duffel bags because of a noticeable increase in police presence at the Morningstar.

During the suppression hearing over the effects seized from the Rodeo, a magistrate judge discredited Allen's version of events (contending that he and Thurman were on their way to a laundromat) and endorsed the government's. The magistrate judge recommended (and the district court accepted) that Allen's motion be denied because (1) the search was incident to a lawful arrest, or, alternatively, (2) was based on probable cause to suspect the car contained contraband.

After trial, the jury convicted Allen of conspiracy involving 668.5 grams of cocaine base (of which 240 grams were reasonably foreseeable to Allen) and of possessing 201.8 grams of cocaine base with intent to distribute. At sentencing, the court agreed with the government that Allen could be sentenced on the basis of crack cocaine. Imposing a sentence based on the quantity

identified in the jury's verdict and taking into account Allen's career-offender status, the court sentenced Allen to concurrent terms of 360 months. Allen timely appeals the denial of his motion to suppress, a number of statements made by the government, and his sentence.

II. Discussion

A. The Motion to Suppress

In an appeal of a suppression ruling, we review the legal question of whether a Fourth Amendment violation occurred de novo. See United States v. Khounsavanh, 113 F.3d 279, 282 (1st Cir. 1997). The trial court's findings of fact, however, will be upheld unless they are clearly erroneous. See United States v. Charles, 213 F.3d 10, 18 (1st Cir. 2000). We will thus affirm "a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision." Id. (quoting United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

Analogizing this case to those involving searches of discrete trunk compartments, Allen argues that the police exceeded the scope of what would otherwise have been a permissible search because they searched the "trunk" of the vehicle.[3] For Allen, the black duffel bag was not in his "immediate control," because he

---

[3]Allen concedes that the initial stop and arrest for driving to endanger were valid.

-6-

could not reach the rear storage area of the vehicle, an Isuzu Rodeo,[4] without exiting the vehicle. Thus, according to Allen, "the rear storage compartment was [not] part of the passenger compartment," and could not be permissibly searched incident to arrest. We are compelled to reject this argument.

It is beyond cavil that pursuant to a custodial arrest, a police officer may search the passenger compartment as well as the contents of any containers found within the passenger compartment of a vehicle in which the defendant is found at the time of arrest. New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Fiasconaro, 315 F.3d 28, 37 (1st Cir. 2002). Such a warrantless search, however, must be proper in scope. See Belton, 453 U.S. at 460. As we have consistently held, post facto scope of search inquiries into the actual reachability of certain areas in a vehicle's passenger compartment are squarely foreclosed. United States v. Doward, 41 F.3d 789, 794 (1st Cir. 1994). Instead, in order to determine whether the search of the vehicle was permissible in scope, "the only question the trial court asks is whether the area searched is generally 'reachable without exiting the vehicle, without regard to the likelihood in the particular case that such a reaching was possible.'" Id. (quoting

---

[4]In his brief, Allen appears to identify his vehicle as an Isuzu Trooper; however the lower court's opinion identifies the vehicle as an Isuzu Rodeo. For our purposes, the distinction is irrelevant.

3 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 7.1(c), at 16-17 (2d ed. 1987)); see United States v. Mayo, 394 F.3d 1271, 1276, 1278 (9th Cir. 2005) (hatch area of a Honda Civic); United States v. Russell, 670 F.2d 323, 327 (D.C. Cir. 1982) (hatch area of a Mustang). Although the cases cited above all involved some form of sedan, this bright-line rule extends to sport utility vehicles as well. See United States v. Olguin-Rivera, 168 F.3d 1203, 1205-07 (10th Cir. 1999) (covered cargo area of an SUV); United States v. Henning, 906 F.2d 1392, 1396 (10th Cir.), cert. denied, 498 U.S. 1069 (1991) ("Where . . . the vehicle contains no trunk, the entire inside of the vehicle constitutes the passenger compartment and may be lawfully searched."). Thus, where a search is limited to areas accessible from within the passenger compartment, including areas that are "hatches," or rear storage areas, it will be permissible in scope.

The vehicle at issue here, an Isuzu Rodeo, is a medium-size sport utility vehicle and does not have a discrete trunk compartment. Instead, it is equipped with a rear storage area that is clearly reachable without exiting the vehicle. Consequently, because it is an "area into which an arrestee might reach in order to grab a weapon or evidentiary item," the search of this portion of the vehicle was valid incident to Allen's arrest.[5]

---

[5]Because we find that the search was valid incident to Allen's arrest for driving to endanger, we need not reach Allen's alternative ground for suppression, that the stop was not supported

-8-

### B. The Government's Closing Arguments

Allen next argues that the government's misstatement in its closing argument prejudiced the outcome of the case. Because defense counsel failed to object to the challenged portions of the government's closing arguments, we review for plain error. United States v. Olano, 507 U.S. 725, 732-37 (1993) (requiring a showing of error that was plain or obvious that affects substantial rights); Fed.R.Crim.P. 52(b). Additionally, "[w]e cannot find that an error has affected the defendant's substantial rights unless it is clear that the error affected the outcome of the proceedings." United States v. Bey, 188 F.3d 1, 6 (1st Cir. 1999).

For a claim that the prosecutor inaccurately stated the evidence to the jury during closing arguments, we must determine "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." Id. at 8 (quoting United States v. Lowe, 145 F.3d 45, 50 (1st Cir.), cert denied, 525 U.S. 918 (1998)). Here, the prosecutor's misstatement was simply not significant enough to have affected the outcome of the case, and thus did not affect Allen's substantial rights. The misstatement Allen points to here

---

by probable cause. United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998).

occurred, in the course of the government's closing argument, when the prosecutor inaccurately asserted that Allen was present in room twelve when Dillingham bought crack from Thurman.[6]  However, the remark consisted of fourteen words in a twenty-six page transcript of the closing summary and, when combined with the repeated cautionary instruction given by the trial judge to the jury that closing arguments are not evidence, leads ineluctably to the conclusion that the error was not prejudicial.  See Lowe, 145 F.3d at 50 (finding that the district court's curative instruction that a closing argument was not evidence, "adequately addressed" the defendant's concerns regarding any misstatement).  There is no evidence that the misstatement was anything other than unintentional and isolated, and, in light of the minimal nature of the error, we have no doubt that it fails to rise to the level of plain error and did not prejudice the outcome of the case.

Allen additionally suggests that the government prejudicially minimized its burden to prove guilt beyond a reasonable doubt when it stated during rebuttal:

---

[6]Specifically, the prosecutor stated:
> You heard from Jeffrey Dillingham that he was in touch. He had learned that Curt Thurman was at Morning Star and when he went there, it was natural for him to have a conversation with the defendant, Willard Allen, and he did.  Mr. Dillingham testified that the defendant took part in that room with that transaction but Mr. Dillingham testified that he went in again and he purchased the drugs and left.

-10-

And you heard all of the evidence that the defendant knew, not only knew that it was there but the drug was cocaine, cocaine base. You don't need to find that with certainty, you don't need to find any of the elements with certainty, that is not what this case is about, it's beyond a reasonable doubt.

Allen interprets this statement as "direct[ing] the jury that there was no need to find 'with certainty' that Defendant had in is possession what he knew was cocaine base." Because again Allen failed to object to this statement at trial, we review only for plain error, which must be clear or obvious and "so shocking that [it] seriously affect[s] the fundamental fairness and basic integrity of the trial." United States v. Mejia-Lozano, 829 F.2d 268, 272 (1st Cir. 1987) (internal quotation marks and citation omitted).

As an initial matter, we are not entirely persuaded that this statement diluted the constitutional burden of proof beyond a reasonable doubt in the way Allen advocates. It is at least plausible that the jury could have understood the prosecutor's statement to mean that the beyond a reasonable doubt standard does not require a finding of absolute mathematical certainty, something which is undoubtedly true. Cf. Cage v. Louisiana, 498 U.S. 39, 40 (1990) (contrasting the problematic use of the term "moral certainty" with the use of the term "mathematical certainty"). Nevertheless, even assuming that this statement comported with Allen's position, it would not have been prejudicial because of the trial judge's accurate, clear, and repeated instructions to the

-11-

jury that the government must prove each element beyond a reasonable doubt. Thus, the prosecutor's isolated statement cannot be deemed so shocking as to call into question the fundamental fairness of the trial. Given the clear instructions of the trial judge and the isolated nature of the comment, whatever error the statement may have had, it cannot be said to have prejudiced, in any way, the outcome of the case.

C. <u>Sentencing on the Basis of Crack Cocaine</u>

Finally, Allen urges this court to reconsider its holding in <u>United States</u> v. <u>Lopez-Gil</u>, 965 F.2d 1124, 1134-35 (1st Cir. 1992), by arguing that the term "cocaine base" in 21 U.S.C. § 841(b) refers to crack cocaine exclusively — a proposition, Allen contends, that would invoke <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), and require remand for re-sentencing because a jury did not find beyond a reasonable doubt that his offenses involved specifically the crack form of cocaine base. This argument is, however, plainly foreclosed. Since <u>Lopez-Gil</u>, we have consistently and routinely rejected any attempt to limit the term "cocaine base," within the meaning of § 841(b), to crack cocaine. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Anderson</u>, 452 F.3d 66, 69 n.1 (1st Cir. 2006) ("In several previous cases, we have noted that crack cocaine is merely one form of cocaine base."); <u>United States</u> v. <u>Pho</u>, 433 F.3d 53, 63-64 (1st Cir. 2006) (reviewing Congress's repeated refusals to ameliorate the definitional disparity between § 841(b)

-12-

and the post-1993 Sentencing Guidelines); <u>United States</u> v. <u>Isler</u>, 429 F.3d 19, 29 (1st Cir. 2005) ("this court has concluded that the term 'cocaine base' in Section 841(b) includes all forms of cocaine base (not simply crack)"); <u>United States</u> v. <u>Medina</u>, 427 F.3d 88, 92 (1st Cir. 2005) (same); <u>United States</u> v. <u>Richarson</u>, 225 F.3d 46, 50 (1st Cir. 2000) (same).  In this case, the government submitted undisputed evidence that the substance seized was cocaine base, and the jury so found. As we have reiterated before, we remain bound to prior panel decisions "in the absence of supervening authority sufficient to warrant disregard of established precedent." <u>United States</u> v. <u>Wogan</u>, 938 F.2d 1446, 1449 (1st Cir. 1991).  Allen's reach for supervening authority is merely a rehash of previously rejected arguments.  Without congressional clarification, new Supreme Court authority, rehearing <u>en</u> <u>banc</u>, or some similarly compelling indication that cocaine base means something other than what we have said it means, Allen's argument is without merit.

**<u>Allen's conviction and sentence are affirmed.</u>**