**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

RAMON RAMIREZ, aka Monserrat
Meza-Ramirez, aka Natividad
Ramirez, aka Manuel Clavo-
Barraza, aka Natividad Vidana
Ramirez,
          *Defendant-Appellant.*

No. 05-50165

D.C. No.
CR-04-01054-ER-5

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAVIER BELTRAN,
          *Defendant-Appellant.*

No. 05-50181

D.C. No.
CR-04-01054-ER-4

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
August 17, 2006—Pasadena, California

Filed January 16, 2007

Before: Alex Kozinski, Diarmuid F. O'Scannlain, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge Kozinski

## COUNSEL

Craig A. Harbaugh, Deputy Federal Public Defender, Los Angeles, California, argued the cause for the defendants-appellants. Maria E. Stratton, Federal Public Defender, and Sean K. Kennedy, Deputy Federal Public Defender, were on the briefs for Defendant-Appellant Beltran. Brad D. Levenson, Deputy Federal Public Defender, was on the reply brief. Jerald Brainin, Los Angeles, California, filed a brief for Defendant-Appellant Ramirez.

Gonzalo P. Curiel, Assistant United States Attorney, Los Angeles, California, argued the cause for the plaintiff-appellee. Debra Wong Yang, United States Attorney, and Thomas P. O'Brien, Assistant United States Attorney, were on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

In this criminal appeal we must decide whether the "collective knowledge" doctrine justifies a warrantless stop of an automobile by one officer at the request of another officer within the same police department.

I

A

This case began with an event in which defendants-appellants Ramon Ramirez and Javier Beltran were not actually involved. On July 8, 2004, police officers in Glendale, California, stopped a Mercury Mountaineer with a California license plate no. 560A975. Its driver was arrested. Officer Kim Lawrence, a 14-year veteran of the Glendale Police Department, ran her drug-detecting dog along and through the vehicle, and the dog alerted to the scent of narcotics. Inside the vehicle the police found a sophisticated secret compartment in the rear cargo area that could be accessed by an electronic release located at the vehicle's front center console. Sergeant Jack Meier, head of the department's vice/narcotics detail, and Officer Joseph Allen, a 14-year veteran of the department, witnessed the search.

B

Ramirez and Beltran came to the attention of the Glendale Police Department on July 20, 2004 when officers were conducting surveillance at a residence located on Brussels Avenue in Los Angeles. Led by Sergeant Meier, the officers observed the same Mercury Mountaineer leave that residence. It was driven by Beltran, while Ramirez sat in the passenger seat. Officer Allen noted that the Mountaineer was registered to another individual at a North Hollywood address; accord-

ing to Allen's written declaration, he believed the vehicle was so registered "to avoid detection by law enforcement while drug trafficking." Officers Lawrence and Allen followed the vehicle as it traveled to a parking lot located on Rosecrans Boulevard in the city of Paramount.

At 12:30 p.m., Officers Lawrence and Allen observed a second vehicle, a Chevrolet Silverado, arrive at the Rosecrans parking lot. Two men got out of the Silverado and approached the Mountaineer; one was carrying what appeared to be a weighted-down gym bag.[1] Ramirez and Beltran met with these individuals near the front of the Mountaineer. Beltran then took the gym bag, opened the rear driver-side door, and placed the gym bag in the Mountaineer. Ramirez entered the vehicle through that same door as Beltran walked around the vehicle to enter through the front passenger-side door. Officer Lawrence then saw the vehicle "rocking back and forth in [a] manner consistent with someone forcibly moving the vehicle." The appellants exited the vehicle and assumed their original positions—Beltran driving with Ramirez in the passenger seat.

During the surveillance at the parking lot, Sergeant Meier received reports from Officers Allen and Lawrence regarding the gym bag and its placement in the rear area of the Mercury Mountaineer. Sergeant Meier knew that this is where the sophisticated hidden compartment had been found on July 8. He was also told that one of the occupants of the Silverado had returned to that vehicle carrying a yellow manila-style envelope or box. At that time, according to his written declaration, Sergeant Meier "formed the opinion that the Mercury was transporting narcotics in the hidden compartment."

Surveillance groups including Officer Lawrence followed both vehicles as they left the parking lot in separate direc-

---

[1] These individuals were Paul Villalba and Leonel Medina. They were co-defendants with the appellants but are not parties to this appeal.

tions. At approximately 1:30 p.m., Sergeant Meier issued a request over the police radio that a uniformed officer make a "traffic stop" of the Mercury Mountaineer as it was traveling on the I-5 freeway. His declaration states that he opted for this tactic "in order to avoid alerting the occupants of the Mercury of an ongoing drug investigation and for officer safety reasons."

Officer Daniel Hulben, a 26-year veteran of the department, responded to Sergeant Meier's request. Officer Hulben stated in a written declaration that he "was aware that Sgt. Meier was the head of a Vice/Narcotics detail, and [Hulben] believed that [Meier's] request related to an ongoing narcotics investigation." Officer Hulben drove onto the I-5 freeway and observed the Glendale police surveillance units. Officers in those vehicles pointed out the Mercury Mountaineer.

Officer Hulben followed the Mountaineer for approximately half a mile. He observed Beltran, still driving the vehicle, repeatedly looking in the rear-view mirror for up to five seconds at a time. The vehicle was straddling two lanes with both passenger-side tires crossing the stripes and box dots.

At 1:36 p.m., Officer Hulben stopped the Mountaineer for failing to drive within a single lane. *See* CAL. VEH. CODE § 21658. He spoke with Beltran, who produced a Mexican driver's license. Officer Hulben then placed Beltran under arrest for driving without a California license, purportedly in violation of California Vehicle Code § 12500(a). Three other uniformed officers arrived to assist Officer Hulben. Ramirez was not arrested at that time, but he was given a ride to the police station.

At 2:35 p.m., Officer Lawrence ran her drug-detecting dog around and through the Mercury Mountaineer. The dog alerted to the odor of narcotics in the rear interior area of the vehicle. The police then searched the hidden compartment and discovered eight kilograms of cocaine.

C

On August 5, 2004, a federal grand jury returned an indictment against Ramirez, Beltran, and three other individuals. The indictment charged the appellants with conspiracy to possess with intent to distribute eight kilograms of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846. It named the July 20, 2004 incident as the requisite "overt act" in the conspiracy.

Ramirez and Beltran each filed a motion to suppress the cocaine found in the vehicle. Senior United States District Judge Edward Rafeedie conducted a suppression hearing on October 26, 2004.

The appellants challenged the validity of the traffic stop and argued that Officer Hulben lacked personal knowledge of the facts purportedly giving rise to probable cause for an automobile search. The district court considered the traffic stop irrelevant; it noted that "the mere fact that this was communicated over the radio to make a traffic stop suggests that it is not the ordinary type of traffic stop." Rather, in the court's view, the issue was simply whether there existed probable cause for the search. The court applied the collective knowledge doctrine, and considered the facts known to all of the officers involved in the investigation and search. Finding probable cause, the court denied both suppression motions from the bench. Judge Rafeedie filed a written order on November 19, 2004.

Thereafter, Ramirez and Beltran reached plea agreements with the government. They conditioned their guilty pleas on the opportunity to appeal the district court's denial of the suppression motions.

The district court sentenced each appellant to 120 months imprisonment, a five-year term of supervised release, and a

special assessment of $100. The district court entered its judgment and commitment orders on March 2, 2005.

Ramirez and Beltran filed timely notices of appeal.

II

At the outset, Ramirez and Beltran contend that the existence of probable cause is irrelevant because the actual or subjective purpose of Officer Hulben's actions was to make a "traffic stop" and that stop was invalid because lane straddling is not illegal unless the driver interferes with other vehicles. They also allege—and the government now concedes—that the arrest of Beltran was improper because his Mexican driver's license qualified him to operate a motor vehicle in California. In their view, the subsequent search of the vehicle was the result of this improper arrest and, therefore, the cocaine should be suppressed.

A

[1] We reject the notion that the subjective purpose of Officer Hulben's traffic stop renders the probable cause inquiry irrelevant. The Supreme Court has made clear that an officer's subjective thoughts play no role in the Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 811-13 (1996). More specifically, the fact that officers acted on one rationale "would not foreclose the [government] from justifying [the search] by proving probable cause." *Florida v. Royer*, 460 U.S. 491, 507 (1983); *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005) ("*Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose.").[2] Thus, it does

---

[2]Further, there is no requirement that the traffic violation have been related to the grounds upon which the officers could have stopped the vehicle to search for contraband. *Devenpeck v. Alford*, 543 U.S. 146,

not matter that Officer Hulben was directed to make a "traffic stop," nor does it matter whether he had valid grounds to make the traffic stop because of lane-straddling. If the officers had probable cause, then the seizure and search of the vehicle will be justified.

We also reject the defendants' argument that the cocaine must be suppressed because Beltran's arrest for driving without a California driver's license was invalid. Although the government appears to concede that Beltran's Mexican driver's license permitted him to operate a motor vehicle in California, the issue is of no consequence because the arrest was not a causal factor in the officers' discovery of the cocaine. The narcotics squad arrived shortly after the stop. Had Beltran not been arrested, Officer Hulben could have simply detained Beltran and Ramirez on the side of the road until the squad— with their drug-sniffing dog in tow—arrived on the scene. Thus, the officers would have discovered the drugs even if Beltran had not been arrested. "[I]f not even the 'but for' test can be met, then clearly the evidence is not a fruit of the prior Fourth Amendment violation." 6 WAYNE LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4(a), at 260 (4th Ed. 2004); *see also United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005) (holding that an allegedly invalid detention "simply did not contribute or lead to" the discovery of a firearm). The stop and search of the Mercury Mountaineer was in no way the fruit of Beltran's arrest; the search was based on previously gathered information, aimed at establishing probable cause to search for contraband.

---

153-54 (2004) (rejecting this Circuit's previous rule); *see also United States v. Cervine*, 347 F.3d 865, 871 n.7 (10th Cir. 2003) ("Although we can find no opinion that applies the collective knowledge doctrine to justify a search when the stop was based on an unrelated traffic violation, we see no reason that the policies underlying the collective knowledge doctrine would not support such a use.").

## B

We must determine, therefore, whether probable cause existed to search the vehicle. At the heart of that inquiry is the "collective knowledge" doctrine. Ramirez and Beltran reject the notion that the stop and search can be justified by probable cause arising from the collective knowledge of all the officers involved. As we discuss further below, they would place two limitations on the doctrine which would render it inapplicable here: (1) a "coordinated-investigation" requirement; and (2) a "minimal communication" requirement. In any case, they further contend, Officer Hulben conducted only a "traffic stop" and was not actually motivated by suspicion of drug trafficking.

The government's position is that the collective knowledge of the various officers involved was sufficient to establish probable cause to believe that the Mercury Mountaineer contained narcotics at the time it was stopped on July 20, 2004. The government rejects the limitations appellants seek to place on the collective knowledge doctrine and insists that courts can look to the facts known by all officers involved, even if those facts are not communicated to the officer making an arrest or stop. The government further urges that we not ignore the existence of probable cause to stop the vehicle simply because Officer Hulben sought to establish an alternative ground for the stop.[3]

[2] Ramirez and Beltran concede that Sergeant Meier and his surveillance team had probable cause to search the vehicle for contraband. Thus, if the facts known by those officers can be imputed to Officer Hulben, the district court's denial of the suppression motions must be affirmed.

---

[3]A district court's denial of a motion to suppress is reviewed de novo, while the factual findings underlying the denial of the motion are reviewed for clear error. *United States v. Gust*, 405 F.3d 797, 799 (9th Cir. 2005).

**[3]** Under the collective knowledge doctrine, we must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by "look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]." *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986). *See generally* 2 WAYNE LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.5 (4th ed. 2004).[4]

## III

Our prior decisions have applied the collective knowledge doctrine in at least two situations.

## A

The first situation is where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned. Application of the collective knowledge doctrine has sparked disagreement in such a circumstance, *see Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) (citing an interjurisdictional conflict); *United States v. Shareef*, 100 F.3d 1491, 1503-04 (10th Cir. 1996) (same), perhaps because no single law enforcement officer knows all of the facts necessary to establish reasonable suspicion or probable cause, and thus aggregation of facts is required.

**[4]** In prior cases, however, we have been willing to aggregate the facts known to each of the officers involved at least "[w]hen there has been communication among agents."

---

[4]The collective knowledge doctrine is otherwise known as the "fellow officer" rule. *See, e.g.*, *State v. Soldahl*, 331 Or. 420, 426, 15 P.3d 564, 567 (2000).

*United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990); *accord United States v. Jensen*, 425 F.3d 698, 704-06 (9th Cir. 2005); *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105 (9th Cir. 2002). At the same time, we have applied the collective knowledge doctrine "regardless of whether [any] *information* [giving rise to probable cause] was actually communicated to" the officer conducting the stop, search, or arrest. *United States v. Bertrand*, 926 F.2d 838, 844 (9th Cir. 1991) (emphasis added); *see also United States v. Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980) (looking to collective knowledge "even though some of the critical information had not been communicated to" the arresting officer); *Sutton*, 794 F.2d at 1426 (same).

[5] Even in this circumstance, the cases suggest a limited requirement that there be a communication but not necessarily the conveyance of any actual information among officers.[5] This is a sensible rule; the purpose to be served by any requirement of communication among the officers is simply to "distinguish[ ] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005); *see also Bernard*, 623 F.2d at 561 ("The officers involved were working in close concert with each other and the knowledge of one of them was the knowledge of all." (internal quotation marks omitted)).

---

[5]In *Bernard*, when we said that "*some* of the critical information had not been communicated to" the arresting officer, 623 F.2d at 560-61 (emphasis added), we were not implying, as the appellants suggest, that *other* pieces of information necessarily must have been communicated. Rather, we were referring to some portion of the facts needed to constitute reasonable suspicion or probable cause—the arresting officer knew some, but not all, of the "critical information." The missing pieces are imputed to him, so long as he was working with the other officers, even though they were not communicated.

B

The facts of this case illustrate a second situation in which the collective knowledge doctrine applies: where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest. The application of the collective knowledge doctrine to such situations has its roots in numerous decisions of the Supreme Court and lower courts.

1

In *Whiteley v. Warden*, 401 U.S. 560 (1971), a county sheriff put out a radio bulletin stating that two individuals were wanted for breaking and entering. The bulletin provided the suspects' names, their descriptions, a description of the vehicle they were likely driving, and the amount of money they had stolen. A patrolman in another police department relied on such information to make a warrantless arrest of the suspects. *Id.* at 563-64. Although in *Whiteley* there was no showing that the sheriff who issued the bulletin had facts sufficient to establish probable cause to arrest, the Court assumed that had the contrary been true, the patrolman's arrest would have been justified. It stated, "Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause." *Id.* at 568. Although in *Whiteley* the bulletin provided factual information to the arresting officer, the Court's analysis seemed to take little account of it.

Then, in *United States v. Hensley*, 469 U.S. 221 (1985), a police officer conducted an investigatory stop based upon another police department's "wanted flyer." The flyer was issued on the basis of articulable facts supporting reasonable

suspicion; it identified and described Hensley and gave the date and location of an alleged robbery. 469 U.S. at 223. Citing *Whiteley*, *supra*, the Court explained:

> [W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest. *It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.* In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Id.* at 231 (emphasis deleted and added). The Court did not emphasize any details of the flyer; it was enough that the officer who issued the flyer knew facts supporting reasonable suspicion. *Id.* at 234. In fact, the Court reversed the Sixth Circuit, which had rested its holding "on the omission from the flyer of the specific and articulable facts which led the first department to suspect [Hensley's] involvement in a completed crime." *Id.* at 230.

Finally, in *Illinois v. Andreas*, 463 U.S. 765 (1983), the Court considered a situation in which a Drug Enforcement Agency agent, having already identified the illegal contents of a container, reopened it following the defendant's arrest but before obtaining a search warrant.[6] The Court rejected a hold-

---

[6]A customs inspector had discovered quantities of marijuana inside a large metal container, which had been shipped by air to the defendant. 463 U.S. at 767. The DEA agent, subsequently called to the scene, inspected

ing by the Appellate Court of Illinois "that [the DEA agent's] absence when the container was resealed by customs officers somehow made less than certain his knowledge of the container's contents." *Id.* at 772 n. 5. Citing *Whiteley*, *supra*, it explained that "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." *Id.* The Court did not mention the substance of any communication from the customs officials to the DEA agent regarding the contents of the container at the time it was resealed. *But see Bailey*, 263 F.3d at 1031 (suggesting that "[t]he facts of [*Andreas*] indicated that the DEA agent knew of the contents of the package based on communications with other members of the investigation").

2

**[6]** We have applied the collective knowledge doctrine in similar circumstances. In *Sutton*, 794 F.2d at 1425-27, the case in which we first recognized the collective knowledge doctrine, we upheld an investigatory stop by a local deputy sheriff where Customs officials had requested that local law enforcement officers be dispatched to an airfield known for narcotics smuggling. In assessing whether there was founded suspicion of criminal conduct, we "combined" the facts known to the Customs officials with those known to the deputy sheriff—without discussing what facts, if any, had been communicated by the former to the latter. *Id.* at 1427. We explained that the collective knowledge doctrine applies "although all of the information known to the law enforcement officers involved in the investigation is not communicated to

---

the contraband. The container was resealed and then delivered to the defendant, who was arrested after taking possession of it at his residence. *Id.* Although the container was reopened prior to the authorities' obtaining a warrant, the Court affirmed the search, holding that "[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal." *Id.* at 771.

the officer who actually makes the stop," and we noted that an officer may act "based in part on information *or directions* from other law enforcement officials." *Id.* at 1426 (emphasis added).

Similarly, in *United States v. Mayo*, 394 F.3d 1271 (9th Cir. 2005), a police officer received a phone call from a known informant, a manager at a motel in an area known for narcotics activity. The motel manager informed the officer of facts constituting reasonable suspicion: that several vehicles were parked nearby; that the occupants got out and began talking; that one of them handed another a package; and that another wiped down the steering wheel of his vehicle and walked away from the group. *Id.* at 1273 & n.1. The officer then radioed a police dispatcher, who in turn notified another officer that he should "investigate suspicious narcotics activity" at the motel. The dispatcher relayed only that directive and a description of the cars involved. *Id.* at 1273, 1275 & n.7. On those facts, we applied the collective knowledge doctrine and upheld the second officer's detention and questioning of the defendant. *Id.* at 1275.

3

Other circuits have applied the collective knowledge doctrine in nearly identical factual situations. In *United States v. Rodriguez*, 831 F.2d 162 (7th Cir. 1987), agents of the DEA had reasonable and articulable suspicion to stop the defendant's vehicle based on prior surveillance of narcotics activity. The DEA, however, asked local law enforcement to conduct a "routine traffic stop" for them. *Id.* at 164. Although the Seventh Circuit ultimately resolved the case on the basis of inevitable discovery, *id.* at 167, it also noted the collective knowledge doctrine's application to the case as follows:

> [T]he detaining officer had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving

rise to the suspicion. Unlike *Hensley*, here the automobile to be stopped with its occupant was pointed out specifically by the requesting officer, and the detaining officer knew the requesting officer was coordinating a large investigation with local agencies. The state trooper was therefore merely acting as an "extension" or agent of the DEA agent and she could act on the DEA agent's suspicions.

*Id.* at 166.

In *United States v. Ibarra-Sanchez*, 199 F.3d 753 (5th Cir. 1999), another similar case, a DEA agent observed a beige van coming and going from a house known for involvement in narcotics trafficking. At one point, the agent witnessed several men loading duffel bags into the van. *Id.* at 756-57. To avoid revealing the existence of the investigation to the van's occupants, he called the El Paso Police Department to make a stop of the vehicle. *Id.* at 757 & n.1. A dispatcher issued a radio bulletin that a DEA agent had requested assistance in stopping a beige van because it was possibly transporting drugs or weapons. A police officer and SWAT team then stopped the van. *Id.* at 757. The Fifth Circuit held that the officers had reasonable suspicion to stop the van because the DEA agent's knowledge was imputed to them under the collective knowledge doctrine. *Id.* at 759-60.

**[7]** Lastly, in *United States v. Burton*, 288 F.3d 91 (3d Cir. 2002), a DEA task force used a confidential informant and surveillance techniques to acquire probable cause to arrest the defendant for narcotics trafficking. *Id.* at 97-99. The agents followed the defendant from the scene of a narcotics transaction, but they requested assistance in stopping his vehicle. A uniformed police officer responded. *Id.* at 95. The Third Circuit held that the information known to the DEA task force was sufficient; "the arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered

by other officers possessing probable cause." *Id.* at 99 (citation omitted). Indeed, the court applied the collective knowledge doctrine without any discussion of what information was communicated to the arresting officer.

                              C

The foregoing cases cut against the appellants' view of the collective knowledge doctrine. In each case, one officer (or team of officers) had all of the necessary facts, and thus no amassing of independently discovered facts was required. In each case, the officer conducting the stop, search, or arrest was given little more than an order or request; the investigating officer or agent simply provided a description of the suspect, thus pointing out *who* was the target. In none of these cases did the investigating officer relay to the second officer the factual basis for his determination that reasonable suspicion or probable cause existed.

**[8]** Although Ramirez and Beltran concede that an investigating officer need not convey all of the facts known to him, they nonetheless insist that "the information conveyed to the [officer conducting the stop, search, or arrest] must relate in some meaningful way to suspected criminal activity." Here, they think probable cause is lacking because Sergeant Meier relayed only a request for a "traffic stop" and failed to mention anything about its purpose. But placing such a limitation on the collective knowledge doctrine would go far beyond the purpose of "distinguish[ing] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Terry*, 400 F.3d at 581. Indeed, where one officer directs another to take some action, there is necessarily a "communication" between those officers, and they are necessarily functioning as a team. Officer Hulben was not investigating Ramirez and Beltran independently; he acted only because of a communication from a fellow officer. *See Shareef*, 100 F.3d at 1503 n.4 (noting that "[i]t is well-established that when an order to stop or arrest a

suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated").

It is true that in some of our prior cases the investigating officer suggested *why* the defendant should be seized, *see, e.g.*, *Mayo*, 394 F.3d at 1273 (noting that the arresting officer was told "to investigate suspicious activity, possibly involving narcotics"), but at no time have we suggested that the conveyance of such information was affirmatively required.[7] Ramirez and Beltran suggest no possible rationale for imposing that kind of requirement, and none is apparent to us. Had Sergeant Meier said explicitly that Ramirez and Beltran were suspected of narcotics activity, such information would not have brought Officer Hulben any closer independently to knowing facts sufficient to constitute probable cause. We would still have to impute facts known only to Sergeant Meier and his team.

Moreover, there is good reason to reject such a proposed limitation:

> The accepted practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause. . . .

---

[7]To the extent there was a substantive communication at issue in our prior cases, we suggested only that such communication was sufficient, not necessary, to invoke the collective knowledge doctrine. *See Jensen*, 425 F.3d at 704-06; *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 489 (9th Cir. 1997); *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994); *Bertrand*, 926 F.2d at 844. In fact, we made this explicit in *Bernard*. *See* 623 F.2d at 561 ("We do not find, however, that this is required, particularly where, as here, the agents were working in close concert."). Thus, we cannot agree with the district court's analysis in *United States v. Newman*, 265 F. Supp. 2d 1100, 1106-08 (D. Ariz. 2003).

. . . The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superior or associates.

*Jensen*, 425 F.3d at 704-05 (citations and internal quotation marks omitted). The Supreme Court has shared these concerns, specifically endorsing our view " 'that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' " *Hensley*, 469 U.S. at 231 (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)).

Accordingly, we reject the appellants' view of the limitations on the collective knowledge doctrine.[8]

## IV

[9] We are satisfied that the collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another. Where one

---

[8]Ramirez and Beltran also suggest that to invoke the collective knowledge doctrine, "all officers must be members of a coordinated criminal investigation." Of course, Officer Hulben clearly *was* part of a coordinated effort—he acted on a request from Sergeant Meier. But their argument seems to go further. They say that collective knowledge cannot apply because "Officer Hulben did not participate in any way with either the surveillance of [Appellants] or the Mountaineer. In fact, Officer Hulben was not even assigned to the narcotics division; he worked as a motor officer in the traffic division for the past 15 years." This argument is without merit, and it clearly conflates the two situations we distinguished above. There is no requirement that Officer Hulben have been connected to or involved in the prior investigation. *See, e.g., Mayo*, 394 F.3d at 1273-75.

officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment. Accordingly, appellant's convictions are

**AFFIRMED.**

---

KOZINSKI, Circuit Judge, concurring:

I join Judge O'Scannlain's opinion, but write separately to emphasize what this case is *not* about. This is not a case where the investigating officers ordered a fellow officer to conduct a traffic stop because they lacked probable cause for a narcotics stop. Sergeant Meier had probable cause to order a narcotics stop, and that's exactly what he did. He requested that the arresting officer make it look like a "traffic stop" as a safety measure, to prevent the risk of harm to a lone officer trying to make a narcotics arrest before backups could arrive on the scene. But that did not change the nature of the stop, which remained—in substance—a narcotics stop.

Concern for the officer's safety was entirely justified because the evidence suggested that the suspects were seasoned drug traffickers with access to sophisticated equipment to ply their trade. It was not unreasonable for Sergeant Meier to fear that the suspects might use force against the officer who made the stop, had they realized the real reason for it. Thus, disguising the stop as a "traffic stop" was a valid law enforcement tactic calculated to ensure an officer's safety. The case would, of course, be quite different if an officer who had *no* probable cause or reasonable suspicion were to conduct (or direct another officer to conduct) a traffic stop in the hope of finding something illegal or delaying the suspect. *That* kind of pretextual traffic stop is clearly prohibited by the

Fourth Amendment. *See United States* v. *Wallace*, 213 F.3d 1216, 1220-21 (9th Cir. 2000).